**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 15, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KIMBERLY D. SHARP,

      Petitioner - Appellant,

v.

No. 14-3090

KAREN ROHLING, Warden, Larned
Correctional Mental Health Facility;
DEREK SCHMIDT,[*] Attorney General for
the State of Kansas,

      Respondents - Appellees.

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 5:10-CV-03100-JTM)**
_____

Jean K. Gilles Phillips, The Paul E. Wilson Center for Innocence and Post Conviction
Remedies, University of Kansas School of Law, Lawrence, Kansas, for Petitioner-
Appellant.

Kristafer R. Ailslieger, Deputy Solicitor General, Office of the Attorney General for the
State of Kansas, Topeka, Kansas, for Respondents-Appellees.
_____

Before **HARTZ**, **GORSUCH**, and **MATHESON**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.

_____

[*] Derek Schmidt is substituted for Stephen Six as the current Attorney General for
the State of Kansas pursuant to Fed. R. App. P. 43(c)(2).

In 2006, Kimberly Sharp lived homeless in Kansas with her two children. One day while she was with three homeless men at a camp site, David Owen approached the group and harangued them for being homeless. An altercation ensued. Two of the homeless men dragged Mr. Owen into the woods and tied him to a tree, where he was later found dead.

While investigating the death, police interviewed Ms. Sharp. During the interview, she confessed to playing a role and accompanied officers to the camp site to re-enact the events. The police videotaped the interview and re-enactment. She was subsequently charged in state court with first-degree felony murder and kidnapping.

Ms. Sharp moved to suppress her confessional statements, arguing they were involuntary because the police promised leniency—no jail—and help finding shelter for her and her children to live. The court denied the motion, concluding her statements were voluntary based on its factual finding that Ms. Sharp was not operating under any promises.

A jury, having received evidence of Ms. Sharp's statements, found her guilty on both counts. The court sentenced her to life in prison (with a chance of parole after 20 years) on the murder conviction and 61 months in prison on the kidnapping conviction, to run concurrently. She appealed the denial of her motion to suppress.

The Kansas Supreme Court affirmed, concluding the record supported the trial court's finding that Ms. Sharp was not operating under any promises. She then filed a petition under 28 U.S.C. § 2254 seeking habeas relief in the United States District Court for the District of Kansas, arguing her confessions were not voluntary and were admitted

in violation of the Fifth and Fourteenth Amendments. The court denied her petition and granted her a certificate of appealability ("COA") under 28 U.S.C. § 2253(c).

On appeal Ms. Sharp challenges the state supreme court's factual findings and seeks habeas relief.[1] We conclude Ms. Sharp overcomes the deferential constraints of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, as to the court's fact-finding. Thus reviewing this matter de novo, we determine Ms. Sharp's confessional statements following a promise of no jail time were involuntary, the state trial court erred by admitting them at trial in violation of Ms. Sharp's Fifth and Fourteenth Amendment rights, and the error was harmful. We therefore reverse the district court and grant Ms. Sharp's petition for a writ of habeas corpus as to her convictions, subject to the state's right to retry Ms. Sharp within a reasonable time.

## I. BACKGROUND

### A. *Factual History*

When reviewing a § 2254 habeas petition, we must presume the state supreme court's factual findings are correct unless the petitioner presents clear and convincing evidence the findings are incorrect. 28 U.S.C. § 2254(e)(1). Although Ms. Sharp challenges the Kansas Supreme Court's factual findings as to whether promises induced her to confess, she does not challenge the court's following description of the factual history:

---

[1] As explained more fully below, we analyze Ms. Sharp's petition under 28 U.S.C. § 2254(d)(2). Although she makes § 2254(d)(1) arguments, her petition also challenges the state supreme court's factual findings, which fits § 2254(d)(2).

As an advocate for the homeless, David Owen used unconventional methods. These methods included offering the use of his phone cards and cell phones for them to call their loved ones. Owen also tried to force them to return to their families by destroying their camps and taking their equipment and supplies. He often photographed the destroyed camps and carried the pictures while visiting other camps.

Owen had been reported missing for several weeks when on July 2, 2006, a canine search team found his body in a heavily wooded area on the bank of the Kansas River in Topeka. No personal property, including identification, shoes, socks, or eyeglasses, was located on or around Owen's body. The officers recovered an axe and some pieces of rope when they searched the surrounding area. The coroner opined that Owen had been dead for several weeks or months, and he listed the manner of death as homicide. Approximately 10 days after discovery of Owen's body, defendant Kimberly Sharp and three other homeless people—her boyfriend Charles Hollingsworth, Carl Lee Baker, and John Cornell—were arrested and subsequently charged with kidnapping and felony murder.

Sharp and Hollingsworth were seated on a bench near the river when detectives first encountered them. Detective Bryan Wheeles noticed that Sharp was scared, so he walked her further down the street, away from Detective Mike Barron and Hollingsworth. Wheeles explained that they needed to talk to her about their investigation into Owen's death. Wheeles and Barron then separately transported Sharp and Hollingsworth to the Topeka Police Department to be interviewed.

Wheeles was informed on the way to the station that there was an outstanding warrant for Sharp out of Emporia, Kansas. When they reached the station, Sharp was put in an interview room where Wheeles *Mirandized* her after telling her that she was under arrest. Wheeles did not tell her specifically why she had been placed under arrest.

Wheeles then conducted a fully recorded interview with Sharp. The interview contained three basic parts: (1) an initial interview lasting 20 or 30 minutes in which Sharp described most of the events surrounding Owen's kidnapping; (2) a re-enactment of the crimes with Wheeles at the homeless camp; and (3) a final interview at the station.

During Sharp's initial interview, she told Wheeles that on Thursday, June 15, 2006, she was sitting around a campfire with Hollingsworth, Baker, and Cornell. Around 7 p.m., Owen walked into the camp and told these homeless people that they should not camp and should call their families.

Everyone was upset by his remarks, especially when he said he would have burned their camp if they had not been there.

Sharp told Wheeles that Baker began arguing with Owen, who then said he was going to call the police. When Owen reached for his phone, Baker and Hollingsworth knocked him to the ground. Hollingsworth then struck Owen and dragged him into the woods.

According to Sharp, she also headed into the woods to see what was going on. There she saw Owen on his knees and Hollingsworth with "an axe that he was going to [use to] kill him like that." Sharp told Hollingsworth, "[N]o, don't do that, don't do that. I can't be an accessory to this shit, you know. I can't do that. I got two kids . . . ." She said Cornell then brought Hollingsworth a rope which was used to tie up Owen. Baker stuffed a rag in Owen's mouth, and the two men continued to beat him. Sharp told Wheeles that Cornell then burned all of Owen's possessions, including his pictures, notebooks, shoes, and socks. Hollingsworth and Baker then dragged Owen into the woods, and Sharp never saw Owen again.

After additional discussion during which Sharp continued to deny any participation, Wheeles specifically asked if she helped burn Owen's possessions. She denied helping burn or having Owen's phone or bag at any point. Sharp eventually admitted that she helped burn. When Sharp then asked if she was going to jail, Wheeles responded, "No, no, no, no, no, no, no, no, [no, no].[2] You are a witness to this thing as long as you do not do something dumb and jam yourself." He further explained that if she had been scared she should tell him and, "Just don't tell me no if I ask you something." Sharp then detailed her role in burning Owen's phones and notebooks.

After Sharp informed Wheeles that her two kids were with Baker at another homeless camp, he left the interview. Upon his return he told her they were going to work together to get her kids "out of harm's way." He advised that Baker was a registered sex offender and had an outstanding arrest warrant for a parole violation. They then left together, retrieved the kids, and brought them back to the station within the hour to be with Sharp.

Approximately 1 hour later Wheeles escorted Sharp to the camp where she re-enacted the events surrounding Owen's kidnapping and murder. During

---

[2] We inserted two additional uses of the word "no" in Detective Wheeles's response to Ms. Sharp's question about going to jail. The interview transcript indicates he said "no" eight times, but the video shows he said it ten times.

the re-enactment, Sharp told Wheeles that when Hollingsworth was standing over Owen with an axe, she had said to him, "No, don't kill him." Wheeles requested clarification, "Did you say 'No, don't kill him,' or did you say, 'No, don't kill him here?'" Sharp responded, "Don't kill him *here*." (Emphasis added.) Sharp also admitted that Hollingsworth had then asked her to bring him some rope, and she told Cornell to go get it. She further admitted that it was her idea to burn Owen's things so there would not be any evidence to tie her to the events. "I said we have to burn it 'cause I don't need the evidence. I don't want to be tied to this."

Following the re-enactment, Wheeles brought Sharp back to the station. He asked her a few more questions and then left her alone in the interview room with her children. Approximately 1 hour after returning to the station, Wheeles was notified that the district attorney's office had decided to charge Sharp. When Wheeles told her that she was going to be placed under arrest, she became angry and upset. Sharp accused Wheeles of lying to her and said that he had tricked her, telling him: "This is bullshit."

*State v. Sharp*, 210 P.3d 590, 596 (Kan. 2009).

In addition to the state supreme court's factual summary, we also note Detective Wheeles began the interview with Ms. Sharp by telling her, "As long as you're straight with me, we're not going to have any problems. . . . I'm not going to lie to you in this investigation at all." App. Vol. I at 38-39.[3] Additionally, once Ms. Sharp's children were retrieved from the camp site, Detective Wheeles placed Ms. Sharp and her children in an interrogation room and asked Ms. Sharp to prepare a written statement describing in detail her observations of the attack on Mr. Owen. *Id.* at 52.

---

[3] The record in this case has documents from the state and federal district court proceedings, and video recordings. Citations to the state record start with "State App." Documents from the federal district court's proceedings are cited as "App." The video recordings are cited as "Suppl. App."

## B. *Procedural History*

### 1. State Court Proceedings

a. *The charge and motion to suppress*

On July 17, 2006, Ms. Sharp was charged with one count of felony murder. On August 25, 2006, the charge was amended to include a second count for kidnapping with intent to injure or terrorize.[4]

On December 11, 2006, the state trial court held a hearing to consider whether Ms. Sharp's statements should be suppressed as involuntary. At the hearing, Detective Wheeles testified that while he and Ms. Sharp were returning to the police station after the re-enactment, he told her the district attorney would ultimately make the charging decision in the case. He also testified that he did not make her any promises, and instead simply urged Ms. Sharp to be truthful and assured her that he would retrieve her children from the homeless camp. Ms. Sharp did not testify. Her counsel argued the statements from the interview and re-enactment should be suppressed because they were not voluntary—they were induced by Detectives Wheeles's promises to be lenient and help find a safe place for her and her children to stay. The trial court viewed the video of the interviews and re-enactment, and denied the motion, ruling as follows:

---

[4] Mr. Hollingsworth, Mr. Baker, and Mr. Cornell were also charged with felony murder on July 17, 2006, and kidnapping with the intent to injure or terrorize on August 25, 2006.

I've seen the -- I'm going to call it the DVD video on the computer screen, two different parts of that. I've not[5] seen the video on the television, the video on the television being the re-enactment, and at all times, I observed Miss Sharp and her actions and I've also observed them here in the courtroom today, that in detail. Detective Wheeles said that she was scared and nervous, but what they discussed in the car, I couldn't tell you, I don't think Detective Wheeles can even tell you; but once they were back at the Law Enforcement Center, she was given her *Miranda* rights, she voluntarily gave up her *Miranda* rights, she talked, I saw her in that interview room, I saw her with a bottle of water. I can even, if I could think of the name of it, I could even tell you what the name of that water is, because it's in a blue type bottle. In addition, there's times when she stretches out in the law enforcement room when he leaves, she stretches from one chair to another one. She appears to be very relaxed, very candid. Her responses are very clear. Occasionally maybe have to ask a question or what's meant. At no time does she appear that she's under duress. At no time does she appear that she's under the influence of anything in so far as her responses to any questions. At no time and definitely you can see it when she's walking in the area down by the river during the re-enactment she has no trouble positioning herself in different positions, positions Detective Wheeles in different positions where people were at given times allegedly when this alleged crime or crimes occurred. Um, she indicated eventually what participation she had in the alleged crime, or at least a portion of it if not all that, I do not know. Um, they got the kids, the kid were in the room with her, she was appropriate in so far as the kids were concerned, in so far as trying to get them to quiet down. There was some bottles -- water bottles, pop bottles or whatever in the room, one little boy playing like it was a gun, this type of thing, psst, psst, psst, psst, like shooting flies or birds in the air. At no time did she appear she was under duress, coercion, operating under any promises. [Sharp] talked to the detective and the length of attention wasn't unusual, she was given things to drink, she was even taken out -- she took them out to the scene of re-enactment. They went to two different camps while they were there. She was able to do that, she was able to walk around, her demeanor was fine. As the officer testified, she was cooperative, which comes across on the video. Therefore, the Court denies the motion to suppress, and the statements in this court's opinion [were] freely, voluntarily and intelligently made and could be used at trial.

---

[5] This appears to be either a misstatement or a transcription error because the judge goes on to describe his observations of the re-enactment video.

State App. Vol. II at 67-69.

b. *Trial*

During the five-day trial, Ms. Sharp's statements to Detective Wheeles were admitted into evidence. The jury found Ms. Sharp guilty of both counts—first-degree felony murder and kidnapping. The court sentenced her to life in prison (with the possibility of parole after 20 years) for the murder conviction and 61 months for the kidnapping conviction, to be served concurrently.

c. *Appeal*

Ms. Sharp appealed her conviction to the Kansas Supreme Court, arguing, among other things, the trial court erroneously denied the motion to suppress because her statements to Detective Wheeles were not voluntary. *Sharp*, 210 P.3d at 594.[6]

i. Majority opinion

The Kansas Supreme Court affirmed the state trial court's decision not to suppress the statements. *Id.* at 606. It reviewed de novo the trial court's legal conclusion that the statements were voluntary, considering under the totality of circumstances whether Ms. Sharp's free will was overborne and her capacity for self-determination was critically impaired. *Id.* at 597. It explained the totality of circumstances test required the court to consider Ms. Sharp's mental state; the manner and duration of her interrogation; her ability to communicate with the outside world; her age, intellect, and background;

---

[6] Ms. Sharp also argued the trial court erroneously limited the cross-examination of Mr. Cornell, erroneously admitted hearsay evidence, and committed cumulative error. *Sharp*, 210 P.3d at 594-95, 605. Ms. Sharp did not reassert these arguments in her § 2254 petition, so we do not discuss them here.

- 9 -

whether the interrogating officers conducted their interview with her in a fair manner; and her fluency in the English language. *Id.* at 598.

Ms. Sharp conceded that her argument mainly challenged the trial court's factual findings that she was not operating under any promises. *Id.* at 598. By limiting her voluntariness argument to the trial court's factual findings, she effectively reduced the supreme court's voluntariness analysis to deciding whether the factual record supported the findings.

1) Ms. Sharp's challenge to factual findings

The Kansas Supreme Court reviewed the trial court's factual findings under the substantial competent evidence standard. *Id.* at 597. It explained "[s]ubstantial competent evidence is that which possesses both relevance and substance and which furnishes a substantial basis in fact from which the issues can reasonably be resolved." *Sharp*, 210 P.3d at 602. The court noted this standard is consistent with the clearly erroneous standard the United States Supreme Court applies to factual findings underlying voluntariness determinations. *See id.* (citing *Arizona v. Fulminante*, 499 U.S. 279, 286-87 (1991)).

Ms. Sharp challenged the trial court's factual findings that she was not operating under any promises. She argued her will was overborne because (a) Detective Wheeles promised her leniency, (b) he promised to help find a place for her and her children to live, and (c) she was in a vulnerable position due to her recent divorce and homelessness (with two children). *Id.* at 597, 606. The court concluded substantial competent evidence supported the trial court's findings that Ms. Sharp was not operating under any promises

during the interviews and re-enactment; she did not appear to be under duress or coercion; and she was relaxed, candid, and cooperative. *Id.* at 602-06.

a) Promise of leniency

Ms. Sharp argued Detective Wheeles promised her leniency in exchange for her confession when he said she would not go to jail. *Id.* at 599. The court rejected Ms. Sharp's contention and found substantial competent evidence showed no such promise was made. *Id.* at 603-05. Alternatively, the court said Detective Wheeles conditioned any such promise, and Ms. Sharp did not satisfy the condition. *Id.* at 604.

First, in its discussion of leniency, the court highlighted Detective Wheeles's testimony from the suppression hearing, where he denied making any threats or promises and instead claimed he had exhorted Ms. Sharp to be truthful. *Id.* at 603. It said the interview transcript supported Detective Wheeles's characterization of his comments and that the transcript does not contain the words "promise" or "threat." *Id.*[7] The court considered the context of the statements and agreed with Detective Wheeles that he caught Ms. Sharp in two lies during the interview, and that he admonished her to tell the truth. *Id.* It concluded Detective Wheeles did not promise her leniency. *Id.*

Second, the court determined that substantial competent evidence supported an alternative factual finding that Detective Wheeles conditioned any promise of leniency on Ms. Sharp not "do[ing] something dumb and jam[ming] [her]self." *Id.* at 603-04. The

---

[7] The court's analysis on this point is confusing because it later acknowledged that Detective Wheeles did use the word "promise" in reference to Ms. Sharp's children. *See id.* at 605. It appears the court limited its comment about the transcript to the portion dealing with leniency.

- 11 -

court understood the comment to mean Detective Wheeles would be lenient as long as Ms. Sharp did not inculpate herself in the crime. *Id.* at 604. Based on the details of the crime and Ms. Sharp's admission to participating, the court concluded she did not satisfy her end of the deal and therefore was not "operating under" the conditional promise. *Id.* It identified two incriminating statements Ms. Sharp made while re-enacting the crime at the camp site. *Id.* She said she told Mr. Hollingsworth, "Don't kill him here," which the court interpreted to mean she did not mind if Mr. Hollingsworth killed Mr. Owen elsewhere. *Id.* And she admitted it was her idea to burn Mr. Owen's belongings. *Id.* The court therefore decided Ms. Sharp failed to satisfy the terms of Detective Wheeles's conditional promise. *Id.* at 605.

   b)  Promise to help Ms. Sharp and her children

The court also concluded substantial competent evidence supported the trial court's finding that Ms. Sharp was not operating under a promise relating to her children when she confessed. *Id.* at 605-06.

First, the court said substantial competent evidence showed Ms. Sharp did not confess in exchange for the police's helping her and her children. *Id.* at 605.

Second, the court determined Detective Wheeles was trying to protect the children by removing them from a homeless camp where they were alone with a convicted sex offender. *Id.*

Third, the court recognized an alternative basis to affirm—the purported promise to help Ms. Sharp's children was a "collateral benefit," which it described as a promise "with no assurance of benefit to [the] accused with respect to the crime." *Id.* (quotations

- 12 -

and emphasis omitted). The court explained such promises generally cannot render a confession involuntary under Kansas law. *Id.* at 605-06.

c) Ms. Sharp's vulnerable position

The court rejected Ms. Sharp's assertion that her vulnerable position during the interview and re-enactment made her statements involuntary. *Id.* at 606. It referenced the video recordings of her interview and re-enactment and concluded substantial competent evidence supported the trial court's factual finding that Ms. Sharp seemed relaxed and provided clear answers, and did not appear to be under duress or coercion. *Id.*

2) Voluntariness under the totality of circumstances

Having rejected Ms. Sharp's challenges to the trial court's factual findings, the court considered facts Ms. Sharp had not challenged on appeal but were relevant to voluntariness: "[Ms.] Sharp was *Mirandized*; she voluntarily gave up her *Miranda* rights; she did not appear to be under the influence of anything; the detention length was not unusual; she was given things to drink; and she was cooperative." *Id.* Based on the trial court's factual findings the state supreme court concluded, under the totality of the circumstances, that Ms. Sharp's statements were voluntary. *Id.* at 606.

ii. Dissenting opinion

One justice dissented, criticizing the majority for relying on Detective Wheeles's testimony from the suppression hearing, at which he explained his subjective reasons for comments he made during his interview with Ms. Sharp. *Id.* at 612. The dissent argued anyone in Ms. Sharp's position would have interpreted Detective Wheeles's assurance

that Ms. Sharp was not going to jail as a promise, and Ms. Sharp fulfilled her end of any deal by not saying "no" in response to his questions, as he had instructed her to do. *Id.*

The dissent also challenged the majority's calling the promises concerning Ms. Sharp's children a "collateral benefit." *Id.* at 612. It argued Ms. Sharp thought she would directly benefit from the promise to find a women's shelter for her and her children. *Id.* More importantly, the dissent argued, the promise offered Ms. Sharp— safety for her young children—was no less compelling than a promise of leniency for the crime being investigated. *Id.*

## 2. **Federal District Court Proceedings**

On May 11, 2010, Ms. Sharp filed a federal habeas petition under 28 U.S.C. § 2254 in the federal district court in Kansas, alleging the state trial court's denial of her motion to suppress violated her Fifth and Fourteenth Amendment rights. The district court, deferring to the state supreme court's factual findings, concluded the court reasonably applied clearly established federal law and denied the petition.

## II. **JURISDICTION AND STANDARDS OF REVIEW**

The federal district court granted Ms. Sharp a COA as to the issues raised in her § 2254 petition. She filed a timely notice of appeal. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003); *Lockett v. Trammel*, 711 F.3d 1218, 1230 (10th Cir. 2013).

AEDPA circumscribes our review of a § 2254 petition by precluding habeas relief as to a claim decided on the merits in state court, unless the determination

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

We review a federal district court's legal analysis of a § 2254 petition de novo.

*Frost v. Pryor*, 749 F.3d 1212, 1223-24 (10th Cir. 2014).

## III. DISCUSSION

Ms. Sharp seeks relief under § 2254, arguing the state supreme court erred in considering the coercive effect of Detective Wheeles's promises during his interview with her. She argues Detective Wheeles induced her confession by promising leniency and assistance in finding shelter for her and her children.

"[T]he ultimate issue of 'voluntariness' is a legal question," but its determination is based on "subsidiary factual questions." *Miller v. Fenton*, 474 U.S. 104, 110, 112 (1985). One such factual question is whether an officer's comments amount to a promise relevant to the voluntariness analysis. *United States v. Lopez*, 437 F.3d 1059, 1064 (10th Cir. 2006) ("The district court's determination that [an officer's] actions amounted to a promise of leniency is a factual finding."); *see also United States v. Morris*, 247 F.3d 1080, 1089-90 (10th Cir. 2001) (reviewing district court's determination that interrogating officer's conduct did not amount to a promise of leniency under the clearly erroneous standard).

Where, as here, a habeas petitioner challenges a factual finding subsidiary to a legal determination, the challenge necessarily implicates both the accuracy of the finding

and the correctness of the legal conclusion. *See Maynard v. Boone*, 468 F.3d 665, 673 (10th Cir. 2006) (explaining applicability of § 2254(d)(1) and § 2254(d)(2) to mixed questions of law and fact such as sufficiency of the evidence, on habeas review). Ms. Sharp's brief does not explicitly base her argument on § 2254(d)(2), but we construe her challenge as seeking habeas relief under both § 2254(d)(1) and § 2254(d)(2). We do not address her § 2254(d)(1) arguments because we conclude she satisfies § 2254(d)(2).

### A.   *Ms. Sharp's § 2254(d)(1) Arguments*

Ms. Sharp argues under § 2254(d)(1) that the state supreme court unreasonably applied clearly established federal law by using an erroneous legal standard to make factual findings about whether Detective Wheeles made promises to Ms. Sharp. She contends the court failed to consider Detective Wheeles's statements from her perspective, as required by *Miller*, 474 U.S. 104. She asserts the state supreme court instead relied on Detective Wheeles's testimony from the suppression hearing, where he described his subjective assessment of his comments.

If the court had reasonably applied federal law, she argues, it would have found Detective Wheeles promised her leniency and assistance in finding shelter for her and her children, and that she believed he had the authority to make such promises. Ms. Sharp details how the record contradicts the state supreme court's findings as to whether Detective Wheeles made promises. She argues the interview transcript contradicts the state supreme court's assertion that Detective Wheeles never used the word "promise." And she contends any reasonable person in her position would have understood Detective

Wheeles's comments to be promises of leniency and assistance for her and her children, made in exchange for her cooperation.

Ms. Sharp also argues the state supreme court unreasonably applied clearly established federal law by finding any promise to help her children was merely a "collateral benefit" that would not benefit her directly. She contends clearly established federal law establishes that promises to benefit family members can be coercive enough to render a suspect's statements involuntary and therefore cannot be dismissed as simply collateral.

### B.   *Ms. Sharp's § 2254(d)(2) Arguments*

Limiting our analysis to § 2254(d)(1) would overlook significant portions of Ms. Sharp's arguments. She contends the state supreme court's voluntariness determination is not entitled to AEDPA deference because it was based on faulty factual findings. She argues that the record does not support those findings. These arguments track § 2254(d)(2), and we construe them as seeking relief under that provision.

Even though Ms. Sharp does not cite § 2254(d)(2) in her brief, she repeatedly attacks the state supreme court's factual findings. She contends, for example, that "[n]o substantial competent evidence exists to support the factual finding that Detective Wheeles did not make promises to Ms. Sharp," Aplt. Br. at 32, and that the state supreme court "unreasonably found that any promises Detective Wheeles made were, at most, conditional promises" based on her not inculpating herself. *Id.* at 39.[8] Throughout her

_____

[8] Ms. Sharp advanced identical arguments to the district court in support of her § 2254 petition. *See, e.g.*, App. Vol. I at 27, 32.

- 17 -

brief, she asserts that the plain meaning of Detective Wheeles's comments contradicts the state supreme court's findings that he did not promise her leniency or assistance in helping find shelter for her and her children. *See id.* at 24, 30-35, 43-44. By repeatedly challenging the accuracy of the court's factual findings, Ms. Sharp effectively asks us to address whether the state supreme court's decision on voluntariness "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

The State acknowledges that Ms. Sharp's arguments challenge the state supreme court's factual findings: "Petitioner is essentially asking this Court to reconsider the state courts' findings of fact." Aplee Br. at 7; *see also id.* at 12 ("When one drills down to the crux of Petitioner's arguments, it appears that she is asking the Court to reconsider the state court findings of fact.").

Other circuits have construed an appellant's § 2254 arguments based on the substance of the challenge, rather than the citation to § 2254(d)(1) or § 2254(d)(2). *See Wheeler v. Rozum*, 410 F. App'x 453, 457 n.4 (6th Cir. 2010) (unpublished) (construing appellant's arguments as seeking relief under § 2254(d)(1) because the petition could be fairly read as seeking relief under that subsection despite the magistrate judge's construing the petition as seeking relief solely under § 2254(d)(2), and the government had not argued appellant's § 2254(d)(1) arguments had been waived). *Compare Peraza v. Campbell*, 462 F. App'x 700, 701 (9th Cir. 2011) (unpublished) (construing appellant's § 2254(d)(1) argument under § 2254(d)(2)), *with* Appellant's Brief, *Peraza v. Campbell*, 462 F. App'x 700 (9th Cir. 2011) (No. 10-15629), 2011 WL 2002975 (seeking habeas

relief under § 2254(d)(1) without citing § 2254(d)(2) while challenging the state court's factual finding by arguing its fact-finding process was defective).[9]

## C.   § 2254(d)(2) Analysis

We limit our analysis to § 2254(d)(2) and do not address Ms. Sharp's § 2254(d)(1) arguments because we determine (1) Ms. Sharp satisfies § 2254(d)(2); (2) on de novo review, Ms. Sharp's confessional statements were involuntary once Detective Wheeles said she would not go to jail; and (3) the trial court committed harmful error by admitting Ms. Sharp's involuntary statements at trial.

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).  If "reasonable minds reviewing the record might disagree about the finding in question," we defer to the state court's determination. *Brumfield v. Cain*, No. 13-1433, slip op. at 8, --- S. Ct. ----, 2015 WL 2473376, at *6 (2015) (quoting *Wood*, 558 U.S. at 301).[10]  But if a habeas petitioner satisfies

---

[9] These unpublished and not precedential out-of-circuit opinions are instructive here.  *See* 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

[10] State court factual findings are presumed correct unless the petitioner shows by clear and convincing evidence they are not.  28 U.S.C. § 2254(e)(1).  The interplay between § 2254(d)(2) and § 2254(e)(1) is an open question.  *See Brumfield*, slip op. at 16, 2015 WL 2473376, at *11; *Grant v. Trammell*, 727 F.3d 1006, 1024 n.6 (10th Cir. 2013).  And it is unclear which standard imposes a greater burden on the petitioner.  *Compare Wood*, 558 U.S. at 301 (explaining § 2254(e)(1)'s standard is "arguably more deferential" than § 2254(d)(2)), *with Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (implying § 2254(d)(2)'s standard is more exacting than § 2254(e)(1)'s— "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher

- 19 -

§ 2254(d)(2), we proceed to review the state court's determination de novo. *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011).

1. **State Supreme Court's Decision Was Based on Unreasonable Factual Finding**

To overcome AEDPA deference under § 2254(d)(2), Ms. Sharp must show the state supreme court's voluntariness decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). It is not sufficient to show that "[r]easonable minds reviewing the record might disagree" about the state supreme court's finding. *Rice v. Collins*, 546 U.S. 333, 341-42 (2006). "[W]here the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Byrd*, 645 F.3d at 1171-72 (quoting *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004)).

The Kansas trial court found Ms. Sharp was not "operating under any promises." State App. Vol. II at 69. The supreme court reviewed that determination and concluded substantial competent evidence showed Detective Wheeles did not promise Ms. Sharp leniency, or alternatively, any promise of leniency was conditioned on Ms. Sharp not inculpating herself. As we point out below, the court was not clear on this next point, but it also decided Ms. Sharp was not operating under a promise to help find shelter for her

---

threshold"). We need not decide the issue here because the state court's finding fails either standard for the reasons explained below.

and her children, or alternatively, any promise to help Ms. Sharp's children was a non-coercive collateral benefit because it would not directly benefit Ms. Sharp. We conclude (1) the supreme court's voluntariness determination was based in significant part on its fact findings about Detective Wheeles's alleged promises; (2) it unreasonably found Detective Wheeles did not promise Ms. Sharp leniency; and (3) it unreasonably found Detective Wheeles did not promise to help Ms. Sharp and her children; or it decided any such promise did not induce Ms. Sharp to confess, which is a voluntariness determination and not a factual finding.

a. *The state supreme court's voluntariness decision was based on its findings about promises*

To satisfy § 2254(d)(2), the habeas petitioner must show that a state court's ultimate determination was based on an unreasonable and material factual finding. *See Byrd*, 645 F.3d at 1172. In this case, the state supreme court's ultimate determination was that Ms. Sharp's confession was voluntary. This determination was based in large part on the court's factual findings about whether Detective Wheeles made promises.

To determine whether a suspect's confession was voluntary, courts consider whether, under the totality of circumstances, the suspect's "will has been overborne and his capacity for self-determination critically impaired." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973). "Under Supreme Court and Tenth Circuit precedent, a promise of leniency is relevant to determining whether a confession was involuntary and, depending on the totality of the circumstances, may render a confession coerced." *Clanton v. Cooper*, 129 F.3d 1147, 1159 (10th Cir. 1997).

Although the Kansas Supreme Court considered various facts to determine whether, in the totality of circumstances, Ms. Sharp's confessional statements were voluntary, its determination hinged on whether Detective Wheeles coerced her confession by making her promises of leniency or assistance for her and her children. The court addressed the existence of such promises and based its voluntariness determination largely on its findings that (1) Detective Wheeles did not promise Ms. Sharp leniency, or alternatively, conditioned leniency on her not inculpating herself, and (2) Ms. Sharp was not operating under any promises to help find shelter for Ms. Sharp and her children, or alternatively, any such promise was merely a non-coercive collateral benefit.

b. *The state supreme court's findings regarding a promise of leniency were unreasonable*

Ms. Sharp argues the following exchange reveals Detective Wheeles made an explicit promise of leniency:

> [Detective Wheeles]: If you were scared and you were helping [Mr. Cornell] burn things because you were afraid they were going to hurt you if you didn't go along, you need to tell me that right now. Are you picking up on what I'm telling you?
> [Ms. Sharp]: Uh-huh.
> [Detective Wheeles]: You cannot, cannot hold anything back in this thing at all, Kim, you can't. This is as serious as it comes.
> [Ms. Sharp]: I know, I know, I know.
> [Detective Wheeles]: Okay.
> [Ms. Sharp]: Yeah, I helped burn.
> [Detective Wheeles]: Okay, now --
> [Ms. Sharp]: Am I going to jail?
> [Detective Wheeles]: No, no, no, no, no, no, no, no, [no, no]. You are a witness to this thing so long as you do not do something dumb and jam yourself. If you were scared, explain to me that you were scared--
> [Ms. Sharp]: I was very.
> [Detective Wheeles]: --when you did what you did. I understand the whole situation.

[Ms. Sharp]:  Okay.
[Detective Wheeles]:  Just don't tell me no if I ask you something.
[Ms. Sharp]:  Okay.

App. Vol. I at 49.

The state trial court found Ms. Sharp was not operating under any promises.  The supreme court understood this to mean Detective Wheeles made no promise of leniency.  Instead, the supreme court found Detective Wheeles simply urged Ms. Sharp to be truthful or made a promise conditioned on Ms. Sharp not inculpating herself.  We conclude the supreme court's findings were unreasonable.

The finding that Detective Wheeles did not promise leniency and instead urged Ms. Sharp to be truthful is unreasonable because it is not a plausible reading of the interview.  At the beginning of the interview, Detective Wheeles told Ms. Sharp he was not upset at her for lying to him when he first approached her and Mr. Hollingsworth.  Detective Wheeles told Ms. Sharp he separated her from Mr. Hollingsworth because he could sense she was afraid and asked her to explain what happened to Mr. Owen.  She described the attack, claiming she did not participate and tried to talk Mr. Hollingsworth and Mr. Baker out of killing Mr. Owen.  Detective Wheeles asked if she helped burn Mr. Owen's belongings and if she thought she was in danger after witnessing the attack.  At first she denied helping to burn the items.  Detective Wheeles explained she was in a serious situation and again asked if she had participated out of fear for her own safety.  Up to this point in the interview, Detective Wheeles's statements were not promises.

Ms. Sharp next contradicted her prior statement and confessed to helping burn Mr. Owen's belongings.  She then asked if she was going to jail.  Detective Wheeles

- 23 -

responded with an unequivocal "no," which he repeated in the video nine more times. His answer was not a simple exhortation to be truthful. He had just received an incriminating answer and immediately and unequivocally reassured Ms. Sharp she was not going to jail. In short, he promised she would not go to jail despite her confession.

Following the "no jail" promise, Detective Wheeles told Ms. Sharp she was just a witness so long as she did not do "something dumb and jam [her]self" and urged her not to say "no" to his questions. But neither comment altered his clear promise of leniency. Detective Wheeles's promise was plain and direct. None of his subsequent statements diluted his insistence that Ms. Sharp would not go to jail despite her confession. His assurance was a promise that Ms. Sharp would be treated leniently. The state supreme court's finding that Detective Wheeles made no promise of leniency was therefore unreasonable.

The court's alternative finding that Detective Wheeles's statement was a promise of leniency conditioned on Ms. Sharp not inculpating herself was also unreasonable. Ms. Sharp already had inculpated herself before he made the "no jail" promise. She had just admitted to helping burn Mr. Owen's belongings, confessing her active role in the crime. It is therefore unreasonable to understand Detective Wheeles's adamant assurance that Ms. Sharp would not go to jail as being conditioned on Ms. Sharp not implicating herself in the crime—she already had.

Based on our review of the record, we conclude the supreme court unreasonably found Detective Wheeles did not promise leniency. The court's alternative finding—that

- 24 -

any promise of leniency was conditioned on Ms. Sharp not inculpating herself—was also unreasonable.

c. *Any finding that Detective Wheeles did not promise to help Ms. Sharp and her children find shelter was unreasonable*

During the interview, Detective Wheeles said he would help Ms. Sharp and her children find shelter. He used the word "promise." As to this matter, the state trial court and the state supreme court both found Ms. Sharp was not "operating under a promise." It is unclear whether this meant (1) Detective Wheeles made no promise or (2) he did make a promise but it did not influence Ms. Sharp to make confessional statements. If the state courts meant the former, they made an unreasonable finding of fact because Detective Wheeles explicitly promised to help with shelter. If they meant the latter, they made a voluntariness determination about the promise. Either way, we will consider this promise in our de novo consideration of voluntariness.

Early in Detective Wheeles's interview with Ms. Sharp, she identified Mr. Baker as a participant in the crime. Detective Wheeles appeared to know the police were already looking for Mr. Baker. After Ms. Sharp admitted her role in the incident, Detective Wheeles asked her if she could show him the camp site where the confrontation occurred. She agreed, which led to the following exchange:

> [Detective Wheeles]: And you can show me exactly where these things are at and what you're talking about because I've got a feeling that my troops are swarming in on that camp right now or probably this evening because, I mean, obviously we need to get [Mr. Hollingsworth] and [Mr. Baker] picked up too and this is a very serious--
> [Ms. Sharp]: [Mr. Baker] is with my kids.
> [Detective Wheeles]: [Mr. Baker] is with your kids at another location?

. . . .

> [Ms. Sharp]: At the new camp site that we're at.
>
> [Detective Wheeles]: The new camp site. Where is the new camp site at in relationship to the old camp site?
>
> [Ms. Sharp]: Okay. You got to go-- it's on a ways down from the, from the camp right-- there's a railroad bridge, there's an Oakland bridge. I can't really explain it.
>
> [Detective Wheeles]: You can show me.
>
> [Ms. Sharp]: Of course, my kids are down there.
>
> [Detective Wheeles]: All right. Let me deal with that real quick, all right? Take a drink of water. Let me deal with that real quick.
>
> [Ms. Sharp]: Who will keep my kids?

App. at 51. Without answering Ms. Sharp's question, Detective Wheeles left the room for approximately ten minutes. When he returned, Detective Wheeles told Ms. Sharp,

> Couple more things you and I need to get squared out and then you and I are going to work together and hard to get your kids out of harms way. Did you know what [Mr. Baker] is wanted for? Okay, he's a registered sex offender, too, okay. He's got a parole violation out for his arrest, okay. So what we are going to do here is you are going to go get in an undercover vehicle with me and another detective. You're going to take us to where this new camp site is. We are going to suck [Mr. Baker] up . . . . We need to get your kids out of the situation. We'll worry about all the other stuff after we get to that point. You need to show me exactly.

*Id.* Detective Wheeles then asked Ms. Sharp a handful of brief questions about the incident, after which the following exchange occurred:

> [Detective Wheeles]: Okay. We're going to leave your stuff here because I'm going to be bringing-- hopefully best case scenario, we'll get you and your kids back here. Now, you're coming back here because we have a lot of things to sort out.
>
> [Ms. Sharp]: Uh-huh.
>
> [Detective Wheeles]: You understand that, right? But you understand I'm trying to help you and your kids out in this situation?
>
> [Ms. Sharp]: Uh-huh. I don't know-- is there anyway that I could like go to a battered women's shelter or something?
>
> [Detective Wheeles]: We'll work out some place for you to go.
>
> [Ms. Sharp]: Because I can't go back to the mission.

[Detective Wheeles]:  Yeah, I can only-- let me handle one thing at a time, but I promise we'll get that worked out.  Let me grab one thing and I'll come get you.

Suppl. App. Vol. I, DVD clip A, at 01:13:19 p.m.-01:13:53 p.m.

The state supreme court found Ms. Sharp was not "operating under any promises." *Sharp*, 210 P.3d at 605-06.  The problem with the statement that Ms. Sharp was not "operating under any promises" is that it is ambiguous.  It could mean the court found Detective Wheeles made no such promise.  It also could mean the court found a promise was made but Ms. Sharp did not act based on that promise.[11]  The court also relied on Kansas law to conclude any benefit to Ms. Sharp's children was a mere collateral benefit, which is typically insufficient to render a confession involuntary.[12]

If the state supreme court found Detective Wheeles made no promise regarding Ms. Sharp's children, this finding was unreasonable.  Ms. Sharp asked Detective Wheeles for help finding a shelter, and he responded, "We'll work out some place for you to go . . . . I promise we'll get that worked out."  App. at 52.  If the court instead determined Ms. Sharp did not answer questions based on the promise to help her and her children, that is part of the voluntariness analysis.

---

[11] The supreme court offered some support for the former understanding by concluding substantial competent evidence (a standard applicable to factual findings) showed Ms. Sharp did not exchange her confession for Detective Wheeles's assistance.

[12] Because we conclude Ms. Sharp satisfies § 2254(d)(2) in showing the supreme court's finding of no promise of leniency was unreasonable, we consider Detective Wheeles's comments about helping Ms. Sharp and her children in our de novo voluntariness determination and need not address the supreme court's "collateral benefit" reasoning.

As we explained above, because Ms. Sharp satisfied § 2254(d)(2) based on the state supreme court's unreasonable finding that Detective Wheeles made no promise of leniency or conditioned leniency, we review the voluntariness of her confessions de novo. *See Bunton v. Atherton*, 613 F.3d 973, 982 (10th Cir. 2010).  We therefore do not need to resolve the court's ambiguous handling of the promise about shelter and will consider that promise in our de novo review of whether Ms. Sharp made involuntary confessions.

2.  **Most of Ms. Sharp's Incriminatory Statements Were Involuntary**

Upon de novo review of Detective Wheeles's interview with Ms. Sharp, we conclude her incriminating statements after Detective Wheeles promised she would not go to jail were involuntary.

### a.  *Legal background and standard of review*

To determine whether a confession was voluntary, courts assess whether the suspect's "will has been overborne and his capacity for self-determination critically impaired." *Schneckloth*, 412 U.S. at 225.  Courts must consider the "totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id.* at 226; *accord Lopez*, 437 F.3d at 1063.  The United States Supreme Court has identified a nonexhaustive list of factors for assessing the voluntariness of a statement:  the suspect's age, education level, whether the suspect was advised of his or her constitutional rights, the length of his or her detention, the nature of the questioning, and any physical punishment such as deprivation of food or sleep.  *Schneckloth*, 412 U.S. at 226; *accord United States v. Toles*, 297 F.3d 959, 966 (10th Cir. 2002).  The totality of the circumstances test does not favor any one of these factors over the others—it is a

case-specific inquiry where the importance of any given factor can vary in each situation. *Schneckloth*, 412 U.S. at 226-27; *accord United States v. Lugo*, 170 F.3d 996, 1004 (10th Cir. 1999).

In light of our determination that AEDPA deference does not apply due to our § 2254(d)(2) analysis, we review the state supreme court's voluntariness determination de novo. *Byrd*, 645 F.3d at 1172.

b. *Voluntariness determination*

The state supreme court found various uncontested facts relevant to the voluntariness analysis. Detective Wheeles advised Ms. Sharp of her *Miranda* rights orally and in writing. She waived her rights and spoke with Detective Wheeles. Her detention was not unusually long—the video indicates Ms. Sharp was in custody for roughly five hours before her arrest. Detective Wheeles provided Ms. Sharp with water to drink, and she did not appear to be impaired. Each of these facts weighs in favor of voluntariness.

Detective Wheeles's assurance that Ms. Sharp would not go to jail for her role in the crime, however, was a critical and troubling moment in the interview. In the first thirty minutes of the interview, Ms. Sharp described witnessing Mr. Hollingsworth and Mr. Baker attack, threaten with an axe, hog-tie, gag, and beat Mr. Owens, and then drag him into the woods. She described the clothes Mr. Owen wore and detailed the personal items he carried. She also admitted she became angry with Mr. Owen and, most importantly, confessed to burning his belongings. Yet, when she asked if she was going

to jail, Detective Wheeles unmistakably insisted, "No, no, no, no, no, no, no, no, [no, no]."

Although Ms. Sharp's initial statement that she helped burn Mr. Owen's belongings may not have been enough on its own to support a conviction, it was nonetheless sufficient to make Detective Wheeles's "no jail" promise at best misleading and probably false. After she admitted to evidence destruction in a murder investigation, Ms. Sharp immediately and anxiously asked if she was going to jail. Having elicited an incriminating statement and clearly wanting more, Detective Wheeles seemingly cleared the legal land mines with his immediate response of ten "no's," but instead left a primrose path. And Detective Wheeles's response was no mere limited assurance of putting in a good word with the prosecutor. *See United States v. Roman-Zarate*, 115 F.3d 778, 783 (10th Cir. 1997) (concluding interviewing agents' "limited assurances" to inform prosecutor about suspect's cooperation are insufficient to render a confession involuntary). He flatly rejected Ms. Sharp's concern about going to jail, without equivocation. He did not say the charging decision was in the prosecutor's hands. He did not express uncertainty about her fate.

After making the "no jail" promise, Detective Wheeles said, "You are a witness to this thing as long as you do not do something dumb and jam yourself." App. Vol. I at 49. It is unclear what this meant other than Ms. Sharp would not be prosecuted and would be a witness as long as she cooperated with Detective Wheeles. He then instructed Ms. Sharp not to say "no" to his questions—further exhortation that she should respond to Detective Wheeles's questions and cooperate with his investigation.

Ms. Sharp's decision to continue providing details does not seem "to have been the result of calculation [instead of] coercion." *Roman-Zarate*, 115 F.3d at 783. Detective Wheeles's promise she would not go to jail induced her confessional statements because he made clear there would be no cost of disclosure. He gave Ms. Sharp a get-out-of-jail-free card, and she obliged by giving him more incriminating details. Ms. Sharp therefore did not simply "balance[] personal considerations with the possible cost of disclosure," *id.*, when making her subsequent confessional statements. Instead, his promise "[wa]s of the sort that may indeed critically impair a defendant's capacity for self-determination." *Lopez*, 437 F.3d at 1065. And despite Detective Wheeles's assurance at the beginning of the interview—that he was "not going to lie to [Ms. Sharp] in this investigation"—his promise that she would not go to jail was false or misleading. *See Clanton v. Cooper*, 129 F.3d 1147, 1159 (holding promise of leniency coupled with misrepresentations about the evidence against the suspect were coercive enough to render statements involuntary).

In isolation, Detective Wheeles's comments about helping Ms. Sharp and her children might not appear coercive. He did not explicitly suggest that Ms. Sharp confess in exchange for his assistance with shelter. But he did mollify her concerns about finding shelter by saying "[w]e'll work out some place for you to go," App. Vol. I at 52, a promise inconsistent with a suggestion of arrest. And his willingness to cut short the interview to retrieve her children from the presence of a registered sex offender added weight to his "no jail" promise of leniency, which he had made only a few minutes earlier.

Ms. Sharp's surprised and angry reaction when Detective Wheeles arrested her at the end of the interview indicated her incriminating statements were not the product of free will because they were given on the false premise she would not go to jail. She accused him of lying and trickery and thought her cooperation would make her a witness, not a defendant. Suppl. App. Vol. I, DVD clip B, at 5:25:16 p.m.-5:26:28 p.m.

Having carefully reviewed the interview video and considered the totality of circumstances, we conclude Ms. Sharp's will was overborne once Detective Wheeles promised her she would not go to jail after she admitted to participating in the crime. Once that promise was made, Ms. Sharp's subsequent incriminating statements were involuntary because she had been told she would not go to jail for her involvement. The trial court therefore erroneously admitted those statements at trial in violation of the Fifth and Fourteenth Amendments. *See Toles*, 297 F.3d at 965.

3. **The State Supreme Court's Error was not Harmless**

a. *Legal background*

A trial court's erroneous decision to admit an involuntary confession into evidence is subject to harmless error analysis. *Fulminante*, 499 U.S. at 295. "[I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard" articulated in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Fry v. Pliler*, 551 U.S. 112, 121 (2007). Under *Brecht*, "an error is harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 116 (quoting *Brecht*, 507 U.S. at 631). "'The inquiry cannot be merely whether there was enough to support the result,

- 32 -

apart from the phase affected by the error. It is rather whether the error itself had substantial influence.'" *Crease v. McKune*, 189 F.3d 1188, 1193 (10th Cir. 1999) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)) (alterations omitted).

"When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,'" the error is harmful and the court must grant the writ. *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995); *see also id.* at 435 ("By 'grave doubt' we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error."). Analyzing harmlessness under *Brecht*, "does not involve a judge who shifts a 'burden' to help control the presentation of evidence at a trial, but rather involves a judge who applies a legal standard (harmlessness) to a record that the presentation of evidence is no longer likely to affect." *Id.* at 437 (quoting R. Traynor, The Riddle of Harmless Error 26 (1970)). The State was required to prove Ms. Sharp's guilt beyond a reasonable doubt. We must decide whether we have grave doubt that the State would have met its burden if the inadmissible evidence had been properly suppressed.

b. Brecht *analysis*

Ms. Sharp was convicted for felony murder under Kan. Stat. Ann. § 21-3401(b) (2006) (repealed 2011), which stated, "Murder in the first degree is the killing of a human being committed: . . . (b) in the commission of, attempt to commit, or flight from an inherently dangerous felony." Kan. Stat. Ann. § 21-3436(a)(1) (2006) (repealed 2011) defined inherently dangerous felonies to include kidnapping. Kansas law defined

kidnapping as "the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person: . . . (c) to inflict bodily injury or to terrorize the victim or another." Kan. Stat. Ann. § 21-3420 (2006) (repealed 2011). We must therefore consider whether the trial court's admission of Ms. Sharp's involuntary statements had a substantial and injurious effect or influence on the jury's determination that Ms. Sharp aided in the crime of taking or confining Mr. Owen with the intent to inflict bodily injury or terrorize him.

    i.   Admissible evidence against Ms. Sharp

Until Detective Wheeles promised Ms. Sharp would not go to jail, all of her statements were voluntary and admissible. And up to that point, Ms. Sharp had already described many details of the crime. She had described witnessing Mr. Hollingsworth and Mr. Baker hog-tie and beat Mr. Owen, and then drag him into the woods. She had explained Mr. Cornell had burned Mr. Owen's belongings, including his phone, notebooks, wallet, glasses, shoes, and socks. Each of these statements indicated she had only witnessed and had not participated in the attack on Mr. Owen. She did, however, implicate herself by confessing to a minor participatory role by saying she "helped burn" Mr. Owen's belongings.

Mr. Cornell testified for the prosecution. He had been charged with felony murder and kidnapping for his role in Mr. Owen's death, but he pled guilty to lesser charges— involuntary manslaughter and kidnapping—in exchange for his testimony. According to his account, Ms. Sharp threw Mr. Owen's belongings into an incinerator before Mr. Owen was tied and beaten. He explained Ms. Sharp was angry with Mr. Owen for

destroying homeless camp sites, and she yelled at Mr. Owen, "How do you like someone destroying your stuff?" State App. Vol. IX at 53. Mr. Cornell testified that after he gave Mr. Hollingsworth the rope used to hog-tie Mr. Owen, Ms. Sharp said, "[w]e're not gonna kill him, we're going to tie him up," *id.* at 64, and "we're gonna make [Mr. Owen] sleep out, tie him to a tree, make him sleep out with the mosquitos, show him how it feels to sleep outside without a tent or blankets," *id.* at 62. Mr. Cornell also testified Ms. Sharp asked him to dump the incinerator in a nearby camp.

On cross-examination, Mr. Cornell conceded his trial testimony conflicted with his prior statements to the police in which he denied having any role in Mr. Owen's death. For example, Mr. Cornell initially told the police he had not participated in tying up Mr. Owen. He instead told them Mr. Owen was already tied up when Mr. Cornell first walked into the camp site. He also had attempted to minimize his role in helping burn Mr. Owen's belongings. At first he claimed he did not help burn. He then admitted to helping burn but claimed Ms. Sharp was already burning Mr. Owen's belongings when Mr. Cornell first walked into the camp site. At trial he testified he arrived at the camp site before any of Mr. Owen's belongings were burned. Mr. Cornell also testified that he expected a lighter sentence because he was testifying for the prosecution.

ii. Inadmissible evidence against Ms. Sharp

In light of our conclusion that Ms. Sharp's statements were involuntary after Detective Wheeles promised she would not go to jail, the following evidence should not have been admitted at trial.

- 35 -

1. "Don't kill him here." The State presented the video recording of Ms. Sharp guiding Detective Wheeles around the camp site, re-enacting the incident, and providing detail about her observations. At one point, Ms. Sharp showed Detective Wheeles where she saw Mr. Hollingsworth threatening Mr. Owen with an ax. At the police station, she had told Detective Wheeles that she thought Mr. Hollingsworth was going to kill Mr. Owen with the ax, and claimed she said, "[N]o, don't do that, don't do that. I can't be an accessory to this shit, you know. I can't do that." App. at 42. But during the re-enactment, Detective Wheeles asked her, "Did you say, 'No, don't kill him,' or did you say, 'No, don't kill him here?'" *Sharp*, 210 P.3d at 596. She responded, "Don't kill him *here*." *Id.* (emphasis in original).

The State relied heavily on this statement at trial. During opening arguments, the State told the jury, "As [Mr. Hollingsworth] left the camp, Kim Sharp followed him. When she got there, David Owen was on the ground. Charles Hollingsworth had this hatchet above David Owen's head. Kim said, 'Don't kill him here.'" State App. Vol. IX at 10. Shortly thereafter, the State again highlighted her statement, explaining that she initially told Detective Wheeles she only said, "Don't kill him," before admitting during the re-enactment that she had said, "I told him not to kill him here." *Id*. at 11-12.

Ms. Sharp's trial testimony indicates both she and the State believed this statement would influence the jury's verdict. On direct examination, she claimed, in contradiction to her videotaped statement, she had not said "Don't kill him here." State App. Vol. XI at 69. The State focused on the statement during Ms. Sharp's cross-examination:

- 36 -

[The State]: [Mr. Owen is] beggin' for his life. You told [Mr. Hollingsworth]-- this is what you told [defense counsel], "No, don't kill him." Is that what you said?

[Ms. Sharp]: Yes, I did.

. . . .

[The State]: In fact, what you told Detective Wheeles was, "Don't kill him here"; is that correct?

[Ms. Sharp]: That is correct. But may I speak on that?

[The State]: No, your counsel can ask you further questions. That's what you told Detective Wheeles on the video reenactment, wasn't it?

[Ms. Sharp]: Yes.

[The State]: You didn't add anything else? He asked you. Did you say, "Don't kill him," or, "Don't kill him here?" That's a choice; right?

[Ms. Sharp]: Yes.

[The State]: And if you did say any one of those things, there was nothing to prevent you to say I didn't say that?

[Ms. Sharp]: Right.

*Id.* at 92-94. On redirect, Ms. Sharp again attempted to rebut the statement she made during the re-enactment:

[Defense counsel]: When Detective Wheeles asked you did you say don't kill him or don't kill him here, what can you-- did you respond to him?

[Ms. Sharp]: I said, "Don't kill him. Don't kill him."

[Defense counsel]: Okay. Now, that's what you said that day or is that what you said to Detective Wheeles?

[Ms. Sharp]: I said to Detective Wheeles, I said, "Don't kill him here."

[Defense counsel]: You had never said that before; correct?

[Ms. Sharp]: No.

[Defense counsel]: You had already given Detective Wheeles your statement at the Law Enforcement Center before you went into the reenactment?

[Ms. Sharp]: Yes.

. . . .

[Defense counsel]: Did you understand the impact of what Detective Wheeles was asking you when he said, don't kill him or don't kill him here?

[Ms. Sharp]: No.

*Id.* at 104-05. And on recross examination, the State again discussed the statement:

> [The State]: You didn't want David Owen to be killed?
> [Ms. Sharp]: No, I did not.
> [The State]: And you told [Mr. Hollingsworth], don't kill him here?
> [Ms. Sharp]: I said, "Don't kill him."
> [The State]: Right?
> [Ms. Sharp]: Yes.
> . . . .
> [The State]: Did you-- but you told [Mr. Hollingsworth], don't kill him here, and he didn't, did he?
> [Ms. Sharp]: No.
> [The State]: Nothing prevented you from writing out as much information as you wanted to in your own handwritten statement, did it?
> [Ms. Sharp]: I was nervous, plus I had my kids with me.

*Id.* at 105-06.

The State repeatedly focused the jury's attention on the statement during closing argument. For example, the prosecutor reiterated the statement and urged the jury "to reflect back to the reenactment tape in this case, her voice, the way she said that, and the way that she pointed, 'Don't kill him here.'" State App. Vol. XII at 36-37. The prosecutor continued, "[Ms. Sharp] told you she told [Detective Wheeles], 'Don't kill him here, I can't be an accessory to this.'" *Id.* at 37.

In her closing arguments, Ms. Sharp's attorney described, at length, how Ms. Sharp had rebutted the statement. For example,

> You heard when [Ms. Sharp] said that she said, "I told him, don't kill him. Don't hurt him. Don't use the axe." She made a written statement. . . . She wrote, "Don't kill him. Don't hurt him. Don't use the axe." It wasn't until they were out in the field, they were doing this reenactment, when Detective Wheeles said, "Tell me what happened." . . . . She's standing here, and she said, "I said, don't kill him. No baby. Don't do it. Don't do it." He says, "Did you say, 'don't kill him or don't kill him here?'" "Here," from his mouth, not her mouth, what she did. She said, "Don't kill him here." And he says-- he tells you-- this was my clarifying question. He just repeated it, "Did you say 'don't kill him here'?" One word. Did he ask the question that would have cleared everything up? Oh my God.

- 38 -

You've been saying-- you said, "don't kill him," all morning, all afternoon-- your oral, at the same time, your written statement. When you just told me what happened, did you mean, don't kill him here? Kill him where else? If that one question would have been asked, we wouldn't be sitting here today. She would have had the chance to say, no, God no. What I meant is, "Don't hurt him. Don't kill him. Don't kill him here."

"Here." There's so many reasons that word could have been said. She actually said it when she was repeating it back to him. She was paraphrasing herself. She couldn't remember what she actually said. When I asked her, did you understand what his question was? Well, no, she certainly didn't understand the impact of what he was asking her. And if he was trying to lead that question, he certainly did a good job.

*Id.* at 52-54. She also explained the re-enactment tape was the only piece of evidence indicating Ms. Sharp said, "Don't kill him here." Other than that tape, the evidence uniformly indicates she said, "Don't kill him." *Id.* at 54. The prosecutor's rebuttal closing arguments again focused on the statement. *Id.* at 61-63.

2. <u>Burning the belongings.</u> During the re-enactment, Ms. Sharp showed Detective Wheeles where she burned Mr. Owen's belongings and explained it was her idea to burn them: "I said we have to burn it 'cause I don't need the evidence. I don't want to be tied to this." *Sharp*, 210 P.3d at 596. Unlike her uncoerced prior confession that she merely "helped" burn Mr. Owen's belongings, this later confession indicates she devised the plan and took the lead to burn Mr. Owen's belongings to destroy evidence of the crime.

During opening arguments, the State said, "[Ms. Sharp will] tell you it was her idea to burn David Owen's property because they had to destroy any of the evidence that would link them to this crime." State App. Vol. II at 12. During her testimony, she attempted to rebut the assertion that she burned Mr. Owen's belongings to destroy evidence of his murder. She explained she instead burned his belongings because she

believed Mr. Owen would have destroyed her property if he had the opportunity. And during the State's closing argument, the prosecutor reminded the jury that Ms. Sharp "decided they had to burn everything else up so the crime couldn't be connected back to them." State App. Vol. XII at 63.

3. <u>The interview videotape.</u> The State presented the video recording of Ms. Sharp's police-station interview. After Detective Wheeles promised she would not go to jail, Ms. Sharp provided more detail about burning Mr. Owen's belongings. Ms. Sharp confessed she and Mr. Cornell destroyed Mr. Owen's belongings in two separate fires, and she personally burned Mr. Owen's two cell phones and notebooks.

4. <u>Written statement.</u> The State also admitted into evidence Ms. Sharp's written statement about the crime, which she prepared after her children were retrieved from the camp site, and which she had moved to suppress.

iii. <u>Taking the stand</u>

Given the attention paid to Ms. Sharp's involuntary confessional statements during the trial, we question whether she would have taken the stand to rebut them and open herself to cross-examination if they had been properly suppressed. *See Wolfe v. Clarke*, 691 F.3d 410, 425-26 (4th Cir. 2012) (affirming district court's grant of § 2254 petition because a *Brady* violation tainted two of defendant's convictions, and affirming district court's decision to vacate all three of defendant's convictions because third conviction relied significantly on defendant's testimony at trial, and the government could not prove defendant would have testified without the improperly admitted evidence). *Cf. Harrison v. United States*, 392 U.S. 219, 224 (1968) ("It is, of course, difficult to unravel the many

considerations that might have led the petitioner to take the witness stand at his former trial. But, having illegally placed his confessions before the jury, the Government can hardly demand a demonstration by the petitioner that he would not have testified as he did if his inadmissible confessions had not been used.").

But she did testify, and on cross-examination she admitted that "in a way" it was her idea to burn Mr. Owen's belongings to destroy all evidence that he had been in the camp site. State App. Vol. IV at 90-91. The State highlighted this statement during closing arguments. State App. Vol. XII at 63 ("She decided they had to burn everything else up so the crime couldn't be connected back to them.").

iv. Grave doubt

We conclude the trial court's decision to deny Ms. Sharp's motion to suppress and to admit her statements was not harmless error under *Brecht* and "had substantial influence" on the result. *Crease*, 189 F.3d at 1193. The untainted evidence against Ms. Sharp included only her vague statement that she had "helped burn," and Mr. Cornell's testimony that Ms. Sharp burned Mr. Owen's belongings out of anger before he was tied up, and knew of Mr. Hollingsworth's and Mr. Baker's intention to drag Mr. Owen into the woods and tie him to a tree. This evidence did not establish the extent of her role or her intent.

Her involuntary confessional statements, on the other hand, were detailed and probative of her specific role in the crime and her state of mind, and the State's case against her depended significantly on them. As the Supreme Court said in *Fulminante*:

> A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . In the case of a coerced confession . . . a reviewing court [must use] extreme caution before determining that the admission of the confession at trial was harmless.

499 U.S. at 296 (quotations omitted). The jury could have interpreted Ms. Sharp's "Don't kill him here" statement from the re-enactment video as evidence that she influenced the commission of the crime and knew Mr. Owen would be killed. Further, in the re-enactment video, Ms. Sharp detailed her role in burning Mr. Owen's belongings, and claimed it was her idea to burn them to destroy evidence of the crime. The jury could have found this evidence showed Ms. Sharp acted with a culpable state of mind and aided in concealing the crime. At trial, the parties paid great time and attention to these statements from the re-enactment video, and both statements featured prominently in opening and closing arguments. Given the State's repeated reliance on these statements, we are convinced the statements played a large role in the jury's verdict.

Moreover, we are troubled that Ms. Sharp might not have testified if her involuntary confessional statements had been suppressed. By testifying, she exposed herself to cross-examination and admitted that "in a way" it was her idea to burn Mr. Owen's belongings to destroy evidence of the crime. This damaging admission also could have significantly affected the jury's verdict.

In summary, although Mr. Cornell's testimony supported the prosecution's case, we have grave doubt whether the trial court's erroneous admission of Ms. Sharp's incriminating statements from the interview, re-enactment, and written statement, and Ms. Sharp's decision to testify on her behalf to attempt to rebut her involuntary

- 42 -

confessional statements combined to have substantial and injurious effect or influence in determining the jury's verdict. Under *Brecht*, we therefore must grant relief.

## IV. **CONCLUSION**

We reverse the district court's denial of Ms. Sharp's § 2254 petition. She satisfied § 2254(d)(2) by showing the state supreme court's voluntariness determination was based on unreasonable factual findings. On de novo review, we conclude her statements after Detective Wheeles assured her she would not go to jail were involuntary. The court erred by denying her motion to suppress and admitting her statements at trial in violation of the Fifth and Fourteenth Amendments. We further conclude the error was not harmless under *Brecht*. We therefore reverse the district court and grant Ms. Sharp's petition for a writ of habeas corpus as to her convictions, subject to the state's right to retry her within a reasonable time. *See Fisher v. Gibson*, 282 F.3d 1283, 1311 (10th Cir. 2002); *see also Bowen v. Maynard*, 799 F.2d 593, 614 n.12 (10th Cir. 1986) ("Generally, a district court ruling in the petitioner's favor in a habeas case provides a reasonable time in order to afford the State an opportunity to re-try the defendant or otherwise correct the constitutional infirmity.").