**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**March 3, 2020**

**FOR THE TENTH CIRCUIT**
_____

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

No. 19-3068

WESLEY WAGNER,

    Defendant - Appellant.

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 5:17-CR-40097-DDC-1)**
_____

Trevor D. Riddle, (Sarah Ellen Johnson with him on the briefs), Monnat & Spurrier, CHTD, Wichita, Kansas, for Defendant - Appellant.

Bryan C. Clark, Assistant United States Attorney (Stephen R. McAllister, United States Attorney, with him on the brief), Office of the United States Attorney, Kansas City, Kansas, for Plaintiff - Appellee.

_____

Before **HOLMES**, **MATHESON**, and **BACHARACH**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

In 2015, the Federal Bureau of Investigation ("FBI") deployed a Network Investigative Technique ("NIT")[1] to identify the Internet Protocol ("IP") addresses[2] of computers accessing "Playpen," a child pornography website.  One of those IP addresses belonged to Defendant-Appellant Wesley Wagner.  Agents executed a warrant for his Kansas residence, where they interviewed him and found evidence of child pornography on a laptop computer.

Mr. Wagner was indicted for receipt and possession of child pornography in violation of 18 U.S.C. §§ 2252(a)(2) and (a)(4)(B).  He moved to suppress the NIT's identification of his IP address, the child pornography evidence in his home, and his statements to the agents.  He also moved to dismiss the indictment, arguing it was obtained through outrageous government conduct in violation of due process.  The district court denied his motions.  Following a three-day trial, a jury convicted him of both counts.

---

[1] For an explanation of how the NIT obtained identifying information from users' computers, see *United States v. Workman*, 863 F.3d 1313, 1315-16 (10th Cir. 2017).

[2] As this court has previously explained,
> An IP address is a unique number identifying the location of an end[-]user's computer.  When an end-user logs onto an internet service provider, they are assigned a unique IP number that will be used for that entire session.  Only one computer can use a particular IP address at any specific date and time.

*United States v. Henderson*, 595 F.3d 1198, 1199 n.1 (10th Cir. 2010) (alterations and quotations omitted).

On appeal, Mr. Wagner argues the district court erred in denying his motions to suppress and motion to dismiss the indictment. He also contends an erroneous evidentiary ruling requires a new trial and that the evidence was insufficient to sustain his convictions. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

Below we summarize the investigative and procedural background. We provide additional background in our discussion of Mr. Wagner's issues on appeal.

### A. *Investigative Background*

#### 1. Investigation of Playpen

The FBI seized Playpen's servers in January 2015 and moved them to a government facility in Virginia. The FBI then hosted the website from this facility, hoping to identify its users.

The FBI obtained a warrant from a magistrate judge in the U.S. District Court for the Eastern District of Virginia ("NIT Warrant"), which authorized agents to install an NIT on Playpen's servers to collect identifying information from the "activating computers . . . of any user or administrator who log[ged] into [Playpen] by entering a username and password." Supp. App. at 89. The activating computer, "wherever located," transmitted the information, including its IP address and host name, to the government facility in Virginia. *Id*. at 83, 90.

The FBI deployed the NIT on Playpen's servers from February 20, 2015 to March 4, 2015, during which 100,000 users accessed the website.

3

2. **Investigation of Mr. Wagner**

Playpen user "soldiermike" logged into the website on February 28, 2015.[3] The NIT identified soldiermike's computer's host name as "SFC-Gunner." App. at 440. It also identified its IP address. Using subpoenaed records from the Tri-County Telephone Association, the FBI traced the IP address to Mr. Wagner and his residence in White City, Kansas.

On September 15, 2015, the FBI obtained a warrant to search Mr. Wagner's residence from a magistrate judge in the U.S. District Court for the District of Kansas ("Residence Warrant"). The warrant authorized agents to seize, among other items, computers used to "display or access information pertaining to a sexual interest in child pornography" or to "distribute, possess, or receive child pornography." Supp. App. at 280.

Six law enforcement agents executed the Residence Warrant. Upon arrival at the residence, Kansas Bureau of Investigation Special Agent Angie Jones informed Mr. Wagner and his wife that they were not under arrest and were free to leave. The Wagners agreed to speak with the agents.

Agent Jones and FBI Special Agent Mike Daniels interviewed Mr. Wagner while his wife waited on the porch. The recorded, 43-minute interview began on a bench outside the home and moved to a police vehicle when it started to rain. Mr.

---

[3] Playpen records later revealed that between January 31, 2015 and March 4, 2015, soldiermike logged into Playpen for eight hours and fifty-nine minutes.

Wagner told the agents he served in the military and retired as a sergeant first class in 2010 due to disability. He denied accessing child pornography on his computer but admitted to a past pornography addiction. He said that he and his wife were the only users of the family laptop, that no one had lived with them in the last year, and that no one else could access their wireless network.

Agents in the home found child pornography on the laptop in a folder labeled "TOR."[4] Agents Jones and Daniels then conducted a second recorded interview of Mr. Wagner about the folder's contents. He denied knowledge of the folder and asked the agents to leave. The agents finished executing the warrant and left without arresting him.

### B. *Procedural Background*

#### 1. Indictment

A federal grand jury indicted Mr. Wagner on two counts: (1) receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2); and (2) possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).

#### 2. Pretrial Motions

Mr. Wagner moved to suppress (1) the NIT's identification of his IP address, (2) evidence seized during the search of his home, and (3) his statements to Agents Jones and Daniels. He argued the NIT Warrant and Residence Warrant were invalid

---

[4] "TOR" is the acronym for "The Onion Router," the encrypted network on which Playpen operated. To access Playpen, a user had to download the TOR browser.

5

and that the agents' interviews violated his *Miranda* and due process rights. He also moved (4) to dismiss the indictment, asserting the FBI's 13-day operation of the Playpen website was outrageous in violation of due process.

Following a hearing, the court denied all four motions. It concluded (1) any evidence seized under the NIT Warrant was admissible under the good faith exception to the exclusionary rule, (2) the Residence Warrant was supported by probable cause and was sufficiently particular,[5] (3) Mr. Wagner's statements were voluntary and elicited in a non-custodial setting, and (4) the Government did not engage in outrageous conduct.

3. **Jury Trial**

Following a three-day trial, a jury convicted Mr. Wagner of both counts. Agent Jones and Amy Corrigan, an FBI forensic examiner, testified for the prosecution. During Agent Jones's direct examination, the Government played the recording of Mr. Wagner's first interview. On cross-examination, defense counsel asked Agent Jones about Mr. Wagner's responses. *See* App. at 520 (Q: "Told you he retired in 2010?" A: "Yes." Q: "Told you that he had served 20 years?" A: "Yes."). The Government objected on hearsay grounds, which the court sustained.[6] Forensic

---

[5] The court also determined that "the good faith exception, if needed, would apply" to the Residence Warrant. Supp. App. at 360.

[6] The Government did not present the recording of Mr. Wagner's second interview at trial. The only trial evidence of Mr. Wagner's statements during the second interview came from Agent Jones's testimony. *See* App. at 496 (Q: "What was the defendant's response to what was being viewed on the laptop?" A: "He

6

examiner Corrigan testified about the child pornography evidence found on the laptop in Mr. Wagner's home.

4. **Post-Trial Motions**

Mr. Wagner moved for a new trial under Federal Rule of Criminal Procedure 33, asserting the court's hearsay ruling during Agent Jones's cross-examination prevented his counsel from highlighting certain statements for the jury. He also moved for judgment of acquittal under Federal Rule of Criminal Procedure 29(c), arguing the Government's evidence was insufficient to prove he knowingly received and possessed child pornography.[7]

The district court denied both motions. It concluded the hearsay ruling was proper, and even if it was not, Mr. Wagner had failed to show it affected his substantial rights. The court also found "sufficient circumstantial evidence to support the jury's guilty verdict." Supp. App. at 474.

5. **Sentence**

The district court sentenced Mr. Wagner to eight years of imprisonment and five years of supervised release. Mr. Wagner timely appealed.

---

claimed he had no knowledge of it. His demeanor toward us changed. He got angry and told us that we need to leave his residence.").

[7] Mr. Wagner moved for judgment of acquittal at the close of the Government's case and renewed his motion after the jury's verdict.

## II. **DISCUSSION**

On appeal, Mr. Wagner contends the district court erred when it (A) applied the good faith exception to the NIT Warrant evidence, (B) upheld the Residence Warrant, (C) admitted his interview statements, (D) denied the outrageous government conduct motion, (E) sustained the hearsay objection, and (F) denied the sufficiency-of-the-evidence motion. We affirm the district court on each issue.

### A. *NIT Warrant Evidence*

The district court denied Mr. Wagner's motion to suppress the NIT Warrant evidence because this circuit, like many others, has held the good faith exception to the exclusionary rule applies to evidence gathered under the warrant issued by the Eastern District of Virginia magistrate judge. *See United States v. Workman*, 863 F.3d 1313, 1318-21 (10th Cir. 2017), *cert. denied*, 138 S. Ct. 1546 (2018); *United States v. Cookson*, 922 F.3d 1079, 1090 (10th Cir. 2019). Mr. Wagner fails to distinguish our precedent.

### 1. **Standard of Review**

"When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government [and] accept the district court's findings of fact unless they are clearly erroneous." *United States v. McNeal*, 862 F.3d 1057, 1061 (10th Cir. 2017) (quotations omitted). We review de novo the "application of the [good faith] exception." *Workman*, 863 F.3d at 1317.

### 2. **Legal Background**

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "When an individual seeks to preserve something as private, and his expectation of privacy is one that society is prepared to recognize as reasonable, . . . official intrusion into that private sphere generally qualifies as a search and requires a warrant." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quotations omitted); *see United States v. Christie*, 717 F.3d 1156, 1162 (10th Cir. 2013) (recognizing a Fourth Amendment privacy interest in a personal computer). A warrant must (1) "be supported by probable cause" and (2) "describe with particularity 'the place to be searched, and the persons or things to be seized.'" *United States v. Russian*, 848 F.3d 1239, 1244 (10th Cir. 2017) (quoting U.S. Const. amend. IV).

Under the exclusionary rule, "evidence obtained in violation of the Fourth Amendment" is generally inadmissible. *United States v. Knox*, 883 F.3d 1262, 1273 (10th Cir. 2018) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). But "exclusion [is] our last resort, not our first impulse." *Herring v. United States*, 555 U.S. 135, 140 (2009) (quotations omitted). Unlawfully obtained evidence is still admissible where its suppression would not "deter[] . . . future Fourth Amendment violations." *Knox*, 883 F.3d at 1273; *see Herring*, 555 U.S. at 141-42.

In *United States v. Leon*, the Supreme Court held that when law enforcement agents rely in "objective good faith" on a later invalidated warrant, "there is no

9

police illegality and thus nothing to deter." 468 U.S. 897, 920-21 (1984). Evidence obtained under this good faith exception is admissible because its suppression "w[ould] not further the ends of the exclusionary rule in any appreciable way." *Id*. at 920 (quotations omitted).

*Leon* identified five instances in which the good faith exception to the exclusionary rule cannot apply:

1. the magistrate judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;"

2. the "magistrate [judge] wholly abandoned his judicial role;"

3. the "warrant [was] based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;"

4. the "warrant [was] so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers c[ould not] reasonably presume it to be valid;" or

5. the officer obtained the warrant based on a "bare bones affidavit and then rel[ied] on colleagues . . . ignorant of the circumstances under which the warrant was obtained to conduct the search."

*Id*. at 923 & n.24 (quotations omitted). We have held the *Leon* good faith exception also cannot apply when the officer's search "exceed[ed] the scope of the warrant." *United States v. Angelos*, 433 F.3d 738, 746 (10th Cir. 2006); *see United States v. Rowland*, 145 F.3d 1194, 1208 n.10 (10th Cir. 1998) ("[T]he *Leon* good-faith exception will not save an improperly executed warrant.").

10

In *United States v. Workman*, we concluded the good faith exception applied to the NIT Warrant evidence. 863 F.3d at 1318-21. We assumed without deciding that the warrant exceeded the magistrate judge's jurisdiction by authorizing the search of computers located outside the Eastern District of Virginia. *Id*. at 1321.[8] But we determined the executing agents relied on the warrant in good faith. *Id*. at 1320-21. They knew the NIT would be installed on servers in the Eastern District of Virginia, where both the magistrate judge was located and any identifying information would be retrieved. *Id.* at 1320. Because we did "not expect [the agents] to understand [the] legal nuances" of a magistrate judge's jurisdiction, we determined they reasonably relied on the warrant's authorization to install the NIT. *Id*. at 1321; *see Cookson*, 922 F.3d at 1090 (applying good faith exception to NIT Warrant evidence under *Workman*). We also concluded the NIT Warrant "d[id] not fit any of the[] five situations" identified in *Leon*. *Workman*, 863 F.3d at 1318.[9]

---

[8] Subject to limited exceptions, magistrate judges may issue warrants to seize evidence located only in their districts. *See* 28 U.S.C. § 636(a)(1) (granting magistrate judges authority "within the district in which sessions are held by the court that appointed the magistrate judge"); Fed. R. Crim. P. 41(b) (authorizing magistrate judges "to issue a warrant to search for and seize a person or property located within [their] district" and outlining exceptions).

[9] Ten other circuits also have applied the good faith exception to NIT Warrant evidence. *See United States v. Levin*, 874 F.3d 316, 323-24 (1st Cir. 2017); *United States v. Eldred*, 933 F.3d 110, 118-21 (2d Cir. 2019); *United States v. Werdene*, 883 F.3d 204, 216-18 (3d Cir. 2018); *United States v. McLamb*, 880 F.3d 685, 691 (4th Cir. 2018); *United States v. Ganzer*, 922 F.3d 579, 584, 590 (5th Cir. 2019); *United States v. Moorehead*, 912 F.3d 963, 971 (6th Cir. 2019); *United States v. Kienast*, 907 F.3d 522, 528-29 (7th Cir. 2018); *United States v. Horton*, 863 F.3d 1041, 1049-52

11

3. **Analysis**

The district court properly denied Mr. Wagner's motion to suppress the NIT Warrant evidence. Even if the warrant was invalid because of its scope, the good faith exception applies under our "binding precedent" in *Workman*. *Cookson*, 922 F.3d at 1090.

Mr. Wagner contends *Workman* does not control because it did not address arguments he raises here to preclude application of the good faith exception. He argues the good faith exception cannot apply because (1) the NIT Warrant affidavit misled the magistrate judge by misrepresenting "critical" information about Playpen's home page, Aplt. Br. at 9-10; (2) the affidavit, without the misrepresentation, did not establish probable cause, *id*. at 8-10; (3) the NIT Warrant was facially deficient for lack of particularity, *id*. at 11-13; and (4) the agents' search exceeded the warrant's scope, which was limited to evidence located in the Eastern District of Virginia, *id*. at 10-11. His arguments lack merit.

First, Mr. Wagner has not shown the NIT Warrant affidavit misled the magistrate judge. *Leon*, 468 U.S. at 923. The affidavit stated Playpen's home page featured two prepubescent females with their legs spread apart, but when the FBI submitted the warrant application, the home page had changed to depict only one female with legs closed. Mr. Wagner does not explain how this change was material

_____

(8th Cir. 2017); *United States v. Henderson*, 906 F.3d 1109, 1119 (9th Cir. 2018); *United States v. Taylor*, 935 F.3d 1279, 1291-93 (11th Cir. 2019).

12

in light of the other facts in the affidavit, *see United States v. Kienast*, 907 F.3d 522, 529 (7th Cir. 2018) (concluding the change in Playpen's home page was "immaterial"), or how the agents' failure to update the affidavit showed "reckless disregard of the truth," *Leon*, 468 U.S. at 923.

Second, Mr. Wagner has not established that the NIT Warrant affidavit, without the description of Playpen's home page, lacked probable cause. To establish the affidavit was "so lacking in indicia of probable cause" to preclude application of the good faith exception, *Leon*, 468 U.S. at 923 (quotations omitted), Mr. Wagner must show the affidavit was wholly "*devoid* of factual support," *Knox*, 883 F.3d at 1274 (quotations omitted). The affidavit here described Playpen's content at length, how users anonymously viewed and uploaded child pornography on the website, and how the NIT would collect users' identifying information. Supp. App. at 64-81. The executing agents' belief that the affidavit contained sufficient information to establish probable cause was not "so wholly unwarranted that good faith [was] absent." *Knox*, 883 F.3d at 1274 (quotations omitted).

Third, Mr. Wagner has not shown the NIT Warrant was so lacking in particularity that the agents "c[ould not] reasonably presume it to be valid." *Leon*, 468 U.S. at 923. The warrant "clearly specifie[d] that only activating computers [of Playpen's users] are to be searched," *United States v. Levin*, 874 F.3d 316, 323 (1st Cir. 2017), and detailed the information for seizure, *see* Supp. App. at 90. We find

13

no facial deficiency in the NIT Warrant that would render the agents' belief in its validity unreasonable. *Leon*, 468 U.S. at 923.[10]

Fourth, Mr. Wagner has not shown the agents exceeded the NIT Warrant's scope. *Angelos*, 433 F.3d at 746. The warrant's first page referred to "Attachment A" for a description of "the property to be searched and . . . its location." Supp. App. at 88. Attachment A authorized the NIT to "obtain[] information . . . from the activating computers . . . of any user or administrator who logs into [Playpen]." *Id.* at 89. It did not limit activating computers to those located in the Eastern District of Virginia.[11]

Mr. Wagner's unsubstantiated arguments do not distinguish *Workman*. Because the district court properly concluded the good faith exception applied, it did

---

[10] Other circuits also have rejected the argument that the NIT Warrant was facially deficient. *See Horton*, 863 F.3d at 1052 (reasoning the court would "not find an obvious deficiency in a warrant that a number of district courts have ruled to be facially valid"); *Eldred*, 933 F.3d at 119 (same); *McLamb*, 880 F.3d at 691 (concluding warrant was not "so facially deficient" when the "boundaries of a magistrate judge's jurisdiction in the context of remote access warrants were unclear at the time of the warrant application" (quotations omitted)).

[11] Mr. Wagner's remaining arguments would not preclude application of the good faith exception. First, he contends the good faith exception does not apply when the warrant exceeds the magistrate judge's issuing authority. But *Workman* held "the *Leon* [good faith] exception applies even if the magistrate judge had exceeded geographic constraints in issuing the warrant." 863 F.3d at 1318. Second, he claims the warrant failed to include a "sufficient[] [computer search] methodology." Aplt. Br. at 13. He offers no authority that a warrant's lack of search methodology prevents application of the good faith exception. Further, our circuit has declined to require warrants to include computer search methodology. *See United States v. Brooks*, 427 F.3d 1246, 1251 (10th Cir. 2005).

not err in denying Mr. Wagner's motion to suppress the NIT's identification of his IP address.

## B. *Residence Warrant Evidence*

Mr. Wagner argues the district court erred in denying his motion to suppress the evidence seized from his home because the Residence Warrant was invalid. He contends the warrant was based on stale information that was insufficient to support probable cause. He also asserts it lacked sufficient particularity because it authorized a search for "any computers" and did not provide a computer search strategy. Aplt. Br. at 23-27. We disagree.

### 1. Standard of Review

We review the district court's "[d]eterminations relating to the sufficiency of a search warrant" de novo. *United States v. Haymond*, 672 F.3d 948, 958 (10th Cir. 2012). But we afford "great deference to the issuing judge's finding of probable cause." *United States v. Edwards*, 813 F.3d 953, 960 (10th Cir. 2015) (quotations omitted). "We ask only whether, under the totality of the circumstances presented in the affidavit, the . . . judge had a substantial basis for determining that probable cause existed." *United States v. Renigar*, 613 F.3d 990, 994 (10th Cir. 2010) (quotations omitted).

### 2. Additional Legal Background

a. *Probable cause*

A search warrant must be based on probable cause. *United States v. Dalton*, 918 F.3d 1117, 1127 (10th Cir. 2019). "An affidavit establishes probable cause for a

15

search warrant if the totality of the information it contains establishes the fair probability that contraband or evidence of a crime will be found in a particular place." *Knox*, 883 F.3d at 1275 (quotations omitted). When determining whether probable cause exists, we apply a "flexible, common-sense standard," under which "no single factor . . . is dispositive." *Id*. (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)).

"[P]robable cause cannot be based on stale information that no longer suggests that the items sought will be found in the place to be searched." *Id*. at 1276 (quotations omitted). "[W]hether information is too stale to establish probable cause depends on the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." *United States v. Villanueva*, 821 F.3d 1226, 1237 (10th Cir. 2016) (quotations omitted).

Courts are less receptive to staleness challenges when the warrant concerns child pornography because "persons interested in those materials [are likely to hoard them] in the privacy of their homes . . . for significant periods of time." *United States v. Perrine*, 518 F.3d 1196, 1206 (10th Cir. 2008) (quotations omitted). We have rejected staleness challenges when information about child pornography was 107 days old, *Haymond*, 672 F.3d at 959; 111 days old, *Perrine*, 518 F.3d at 1205-06; and even five years old, *United States v. Riccardi*, 405 F.3d 852, 860-61 (10th Cir. 2005) (reasoning that the "the passage of time [was] not of critical importance" when

16

the child pornography "offense . . . [was] ongoing and continuing in nature" (quotations omitted)).[12]

b. *Particularity*

The Fourth Amendment "specifies only two matters that must be 'particularly describ[ed]' in the warrant: 'the place to be searched' and 'the persons or things to be seized.'" *United States v. Grubbs*, 547 U.S. 90, 97 (2006). A warrant is sufficiently particular when it "enables the searcher to reasonably ascertain and identify the things authorized to be seized." *United States v. Sells*, 463 F.3d 1148, 1154 (10th Cir. 2006) (quotations omitted); *see United States v. Grimmett*, 439 F.3d 1263, 1269 (10th Cir. 2006) (noting our circuit takes "a somewhat forgiving stance when faced with a 'particularity' challenge to a warrant authorizing the seizure of computers").

We have held that when a warrant for child pornography evidence "as a whole" limits the agents' search to evidence related to child pornography, the warrant is not overbroad for failure to expressly require that each individual category of items for seizure pertain to child pornography. *United States v. Brooks*, 427 F.3d 1246, 1252 (10th Cir. 2005) (rejecting technical reading of seemingly broad categories of items for seizure where warrant, "as a whole, . . . more naturally instruct[ed] officers

---

[12] Other circuits have taken a similar approach to staleness in the child pornography context. *See, e.g.*, *United States v. Irving*, 452 F.3d 110, 125 (2d Cir. 2006) (characterizing "staleness determination" in this context as "unique" and concluding two-year-old information was not stale); *United States v. Newsom*, 402 F.3d 780, 783 (7th Cir. 2005) ("Information a year old is not necessarily stale as a matter of law, especially where child pornography is concerned.").

to search . . . only for evidence related to child pornography" (emphasis omitted));
*see Grimmett*, 439 F.3d at 1270-71 (concluding warrant authorizing seizure of "any and all computer equipment" was not overbroad because it contained other "sufficiently particularized language requiring a nexus with child pornography").

Although a warrant must describe with particularity the items sought on a computer, *United States v. Walser*, 275 F.3d 981, 985-86 (10th Cir. 2001), it need not include "a particularized computer search strategy," *Brooks*, 427 F.3d at 1251; *see Russian*, 848 F.3d at 1245 n.1 ("declin[ing] to require a search protocol for computer searches" because "courts are better able to assess the reasonableness of search protocols ex post").

3. **Analysis**

The Residence Warrant met the probable cause and particularity standards.

a. *Probable cause*

The six-month-old information of soldiermike's Playpen use[13] did not "suggest[] that the items sought [would no longer] be found" in Mr. Wagner's residence. *Knox*, 883 F.3d at 1276 (quotations omitted). Soldiermike's Playpen use was "ongoing." *Riccardi*, 405 F.3d at 861; *see* Supp. App. at 210 (noting soldiermike was "actively logged into" Playpen for nearly nine hours from January 31 to March 4, 2015). County records linked soldiermike's IP address to Mr. Wagner's residence

---

[13] Soldiermike last accessed Playpen on March 3, 2015. The FBI obtained the warrant for Mr. Wagner's residence on September 15, 2015.

18

in White City, Kansas. *See United States v. Tagg*, 886 F.3d 579, 587 (6th Cir. 2018) ("[A] nexus exists when law enforcement connects the IP address used to access a website to the physical location identified by the warrant."). Given the propensity of child pornography consumers to "hoard" their materials "in secure places, like a private residence," *Perrine*, 518 F.3d at 1206, the magistrate judge had a "substantial basis" to believe evidence of child pornography would be at the residence associated with soldiermike's IP address six months after Playpen was accessed, *Renigar*, 613 F.3d at 994 (quotations omitted).

b. *Particularity*

The Residence Warrant also "ensure[d] that the search [was] confined in scope to particularly described evidence." *Cassady v. Goering*, 567 F.3d 628, 636 (10th Cir. 2009) (alterations and quotations omitted). Although a few of the 16 categories of items listed for seizure did not reference a specific subject matter, *see, e.g.*, Supp. App. at 280, 282 (identifying "[a]ny and all computer software" and "[a]ny and all cameras"), most of the categories specified child pornography, *see, e.g.*, *id.* at 280 (limiting agents to seizure of items "depict[ing] child pornography," "pertaining to a sexual interest in child pornography," and "pertaining to the possession . . . of child pornography"). Mr. Wagner may not rely on selective portions of a warrant that, read in context, "contained sufficiently particularized language requiring a nexus with child pornography." *Grimmett*, 439 F.3d at 1271.[14]

---

[14] Relying on *United States v. Griffith*, 867 F.3d 1265, 1276 (D.C. Cir. 2017), Mr. Wagner argues the Residence Warrant was overbroad because it authorized the

19

Mr. Wagner's argument that the Residence Warrant required a detailed computer search strategy lacks merit. He relies exclusively on unpublished out-of-circuit decisions that conflict with our precedent. *See Brooks*, 427 F.3d at 1251; *Russian*, 848 F.3d at 1245 n.1.

\*    \*    \*    \*

In sum, the district court properly concluded the Residence Warrant was valid. The warrant was supported by probable cause and particularly described the place to be searched and the items to be seized.

## C. *Interview Statements*

Mr. Wagner argues the district court erred when it denied his motion to suppress his interview statements. He contends Agents Jones and Daniels were required to provide *Miranda* warnings because they subjected him to a custodial interrogation. He also asserts his statements were involuntary. The record belies both arguments.

---

seizure of any computer located at the residence regardless of ownership. *Griffith* is inapposite. In that case, the officers suspected the defendant was the getaway driver in a homicide. The court held a warrant authorizing seizure of "all cell phones and electronic devices" in the defendant's home was overbroad because the supporting affidavit established probable cause to search only those "devices owned by [the defendant]" or "linked to the [homicide]." *Griffith*, 867 F.3d at 1276. Here, by contrast, the agents had probable cause to search Mr. Wagner's residence for any device that soldiermike could have used to access Playpen or child pornography. Because soldiermike's identity was unknown, the Residence Warrant was not overbroad for failure to limit seizure to devices Mr. Wagner owned.

## 1.  Standard of Review

When reviewing a district court's denial of a defendant's motion to suppress his statements, we "view the evidence in the light most favorable to . . . the government" and "accept the district court's factual findings unless they are clearly erroneous."  *United States v. Williston*, 862 F.3d 1023, 1031 (10th Cir. 2017).  We review de novo the applicability of *Miranda*, *see id.*, and the voluntariness of a defendant's statements, *McNeal*, 862 F.3d at 1061.  But we review "subsidiary factual questions," such as whether the police threaten or coerce the defendant, for clear error.  *Id.* (quotations omitted); *Sharp v. Rohling*, 793 F.3d 1216, 1226 (10th Cir. 2015) (quotations omitted).

## 2.  Additional Investigative Background

Agents Jones and Daniels audio-recorded their initial encounter with the Wagners and their first interview of Mr. Wagner.  We have listened carefully to the recording and summarize it below.[15]

a.  *Initial encounter*

Upon arrival at the Wagner residence, Agent Jones informed Mr. and Mrs. Wagner that "neither one of [them] [was] under arrest and [they we]re free to leave at

---

[15] At the suppression hearing, the district court reviewed a recording that included both the agents' initial encounter with the Wagners and their first interview of Mr. Wagner.  At trial, the Government presented an excerpted version of this recording that contained only the interview, with minor redactions.  As noted, the Government did not present the recording of Mr. Wagner's second interview.  We rely only on the recording introduced at trial when summarizing Mr. Wagner's interview statements and discussing the sufficiency of the evidence.

21

any time." Hrg. Audio Ex. 9 at 00:10-15. She said the Wagners would not be "going with [the agents] today" and the agents would "get out of [their] hair as soon as [they could]." *Id.* at 01:00-06. She told Mrs. Wagner to "hang out here on the porch" while she and Agent Daniels interviewed Mr. Wagner. *Id.* at 02:22-28.

    b. *Interview*

Mr. Wagner's first interview began on a bench outside his home and moved to a police vehicle when it started to rain. Agent Jones explained the interview's purpose was to get "identifying information," "find out about [Mr. Wagner's] Internet activities," and learn about the "electronics [the agents were] going to find in the house." Tr. Audio Ex. 3 at 00:05-20. Mr. Wagner agreed to continue speaking with Agents Jones and Daniels. *Id.* at 00:20-25.

Mr. Wagner said no one other than he and his wife had lived in their house in the last year. *Id.* at 05:50-07:25. He denied viewing child pornography but admitted to having a pornography addiction "quite a few years ago," *id.* at 13:20-14:30, and to accessing pornography the previous day, *id.* at 14:50-15:15. He also stated he suffered from post-traumatic stress disorder ("PTSD") but did not currently require medication. *Id.* at 15:58-16:25.

Agent Jones said the FBI believed someone in his house had accessed a child pornography website. *Id.* at 19:22-32. She stated the agents "just want to get to the bottom of what's going on" so they can "wrap this up and move on" to finding individuals "who are actually touching and harming kids." *Id.* at 20:10-50.

22

Mr. Wagner again denied viewing child pornography and stated that no visitor had stayed at his house in the last year. *Id*. at 21:35-22:16. He also explained that his wireless Internet connection was password-protected and did not extend beyond his driveway. *Id*. at 22:17-23:35.

Agent Jones said the FBI knew a computer in his home had accessed child pornography. *Id*. at 24:13-27. The more Mr. Wagner could disclose about the computer's contents, she said, the "better it [would be] for [him]." *Id*. at 27:20-42.

When Mr. Wagner continued to deny knowledge of child pornography on any device in the house, Agent Jones asked,

> Is there anything that you're reluctant to tell us? I mean, this is really your only opportunity because once we leave here, we go to the lab, the computer speaks for itself. So, just—spit it out—tell us what we need to know. [Laughs.]

*Id*. at 34:00-14. Mr. Wagner did not admit to accessing child pornography. *Id*. at 34:15-35. At the end of the interview, the agents said he could "go over" by the house while they "chat with [his wife]." *Id*. at 35:50-36:02. The agents finished the search without making an arrest.

### 3. Additional Legal Background

Statements to police are subject to procedural safeguards rooted in the Fifth Amendment's Self-Incrimination and Due Process Clauses.

#### a. *Self-Incrimination Clause*

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held the Fifth Amendment Self-Incrimination Clause "prohibits admitting statements given by a

23

suspect during 'custodial interrogation' without a prior warning." *United States v. Cook*, 599 F.3d 1208, 1213 (10th Cir.), *cert. denied*, 562 U.S. 933 (2010).

*Miranda* warnings are required only "at the moment [the] suspect is in custody and the questioning meets the legal definition of interrogation." *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008) (quotations omitted). Courts typically conduct this analysis in two steps, addressing (1) whether the questioning constituted an interrogation, and (2) whether the suspect was in custody for *Miranda* purposes. *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011). Because the Government concedes the agents' questioning of Mr. Wagner constituted an "interrogation,"[16] we focus on the "in custody" requirement.

An interrogation is custodial when, "in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (alterations, citations, and quotations omitted). "[C]ase law is well established that a [suspect] is not in custody" when he voluntarily cooperates with the police. *Jones*, 523 F.3d at 1239 (quotations omitted). Only when "a suspect's freedom of action is curtailed to a 'degree associated with formal arrest'" is he "in custody" for *Miranda* purposes. *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)).

---

[16] *See* Aplee. Br. at 34 (referring to Mr. Wagner's "interrogation"); *see also* App. at 93 (noting "the government does not dispute that [the agents] 'interrogated' Mr. Wagner").

24

Several non-exclusive factors inform the custody analysis: (1) "the extent . . . the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will," (2) "the nature of the questioning," (3) the extent police officers "dominate the encounter," *id*. at 1240 (quotations omitted), and (4) "the release of the [suspect] at the end of the questioning," *Howes*, 565 U.S. at 509. Officers may "dominate" an encounter by displaying a weapon, making physical contact, isolating the suspect in a police-controlled environment, or appearing in overwhelming numbers. *See United States v. Chee*, 514 F.3d 1106, 1113 (10th Cir. 2008).

b. *Due Process Clause*

The Fifth Amendment Due Process Clause "erects its own barrier to the admission of a defendant's inculpatory statements." *J.D.B.*, 564 U.S. at 280. "[W]hen the government obtains incriminating statements through acts, threats, or promises which cause the defendant's will to be overborne, it violates the defendant's [due process] rights and the statements are inadmissible . . . ." *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006) (quotations omitted); *see Colorado v. Connelly*, 479 U.S. 157, 164 (1986). A defendant's statements must be the product of "an essentially free and unconstrained choice." *Lopez*, 437 F.3d at 1063 (quotations omitted).

We analyze the voluntariness of a defendant's statements based on "the totality of all the surrounding circumstances, [including] both the characteristics of the

25

[defendant] and the details of the interrogation." *Sharp*, 793 F.3d at 1233 (quotations

omitted).  Several factors are relevant to this analysis:

> the [defendant's] age, education level, whether the
> [defendant] was advised of his or her constitutional rights,
> the length of his or her detention, the nature of the
> questioning, and any physical punishment such as
> deprivation of food or sleep.

*Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).  Also relevant is

whether an officer's actions or statements amount to a "promise of leniency" in

exchange for the defendant's cooperation or confession.  *Id*. at 1229.  "The

Government bears the burden of showing, by a preponderance of the evidence, that a

[defendant's statements were] voluntary."  *Lopez*, 437 F.3d at 1063 (citing *Missouri

v. Seibert*, 542 U.S. 600, 608 n.1 (2004)).

4.  **Analysis**

Having carefully listened to the audio evidence, we agree with the district

court that Mr. Wagner was not in custody for *Miranda* purposes and that his

statements were voluntary.  The admission of his statements from his first interview

did not violate *Miranda* or his due process rights.

a.  *Non-custodial*

The agents' interview of Mr. Wagner was not custodial.  Considering "the

objective circumstances," *Howes*, 565 U.S. at 509, his "freedom of action [was not]

curtailed to a degree associated with formal arrest," *Jones*, 523 F.3d at 1239

(quotations omitted).  Four factors support this conclusion.

26

First, Agent Jones repeatedly informed Mr. Wagner he was free to leave. *See id*. at 1240. Agent Jones said he was not under arrest, that he was "free to leave at any time," and that he would not be "going with [them] today." Hrg. Audio Ex. 9 at 00:10-15, 01:00-06. "That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview." *Jones*, 523 F.3d at 1240 (quotations omitted).

Second, the agents' questioning was not coercive. *See id*. at 1240. The district court's finding "that the officers questioned Mr. Wagner in a cordial manner during both interviews," App. at 96, is not clearly erroneous. Our own listening to the interview supports this conclusion. The agents' questioning, even when directed at soliciting a confession, *see* Tr. Audio Ex. 3 at 34:00-14 (asking Mr. Wagner to "just—spit it out"), remained "calm and conversational," *Chee*, 514 F.3d at 1114.

Third, the encounter was not police-dominated. *Jones*, 523 F.3d at 1240. Six law enforcement agents executed the Residence Warrant, but only two interviewed Mr. Wagner. *See id.* at 1242 (finding lack of police domination where, despite the presence of multiple agents, the defendant "was not confronted by them simultaneously or aggressively").[17] The record does not indicate the agents displayed

---

[17] As noted, the first interview moved to a police car because it started to rain. Mr. Wagner does not argue the change in location supports custody. In any event, location is not controlling. *See United States v. Lamy*, 521 F.3d 1257, 1263 (10th Cir. 2008) ("Although the vehicle belonged to the agents, location alone does not compel the conclusion that a defendant is in custody, so long as his freedom was not curtailed to a degree similar to arrest."); *Jones*, 523 F.3d at 1243 (noting "[t]he

27

their weapons or made physical contact. *See id.* at 1240. Although they separated

Mr. Wagner and his wife, she remained nearby on the porch.[18]

Fourth, the agents left Mr. Wagner's residence without making an arrest. *See*

*Howes*, 565 U.S. at 509 (noting a suspect's "release . . . at the end of the questioning"

is relevant to the custodial analysis). Mr. Wagner's asking the agents to leave further

indicates he "was not in custody or otherwise deprived of his freedom of action in

any significant way." *Chee*, 514 F.3d at 1113 (quotations omitted).

"[E]xamin[ing] all of the circumstances," a reasonable person in Mr. Wagner's

position would have felt at liberty to terminate the interview and leave. *Howes*, 565

U.S. at 509 (quotations omitted). *Miranda* warnings were not required. *Jones*, 523

F.3d at 1239.

b. *Voluntary*

"[C]onsidering both the characteristics of [Mr. Wagner] and the details of the

interrogation," we agree with the district court that the Government has shown by a

preponderance of the evidence that Mr. Wagner's statements were voluntary. *Lopez*,

437 F.3d at 1063. Agent Jones's clear statements that Mr. Wagner was free to leave

and the conversational nature of the agents' questioning show his statements were the

product of "an essentially free and unconstrained choice." *Id*.

---

reason for detaining [the suspect] in the patrol car—specifically, the inclement weather—derogates from whatever coercive elements are otherwise normally attendant thereto" (quotations omitted)).

[18] Mr. Wagner does not argue the first interview's duration made it coercive. *See* Aplt. Br. at 30-32.

28

Mr. Wagner argues his statements were involuntary because (1) Agent Jones "coerced [him] by promises of leniency," (2) Agents Jones and Daniels threatened him to confess by characterizing the evidence against him as "irrebuttable" and stating the interview was his "only opportunity" to talk, and (3) his PTSD and military background made him "susceptible to the [agents'] coercive tactics." Aplt. Br. at 33-35 (quotations omitted). Each argument fails.

First, Agent Jones did not promise Mr. Wagner leniency. He contends she "implied" the FBI would "dismiss[] . . . the investigation if he talked to them." *Id*. at 34. Agent Jones said his cooperation would allow them to "wrap this up and move on" to identifying more serious offenders. *See* Tr. Audio Ex. 3 at 20:10-50. But her expressed interest in finishing the investigation was not "a promise that [Mr. Wagner] would be treated leniently." *Sharp*, 793 F.3d at 1231 (determining officer promised leniency when he stated defendant "would not go to jail"); *see Lopez*, 437 F.3d at 1064-65 (concluding officer promised leniency after telling defendant he would receive 54 fewer years in prison if he said the killing was a mistake). Although Agent Jones may have suggested Mr. Wagner's conduct was not an FBI priority, she did not "impl[y]"—let alone "promise"—the FBI would "dismiss" its investigation. Aplt. Br. at 34.

Second, the agents' questioning was not threatening. Agents Jones and Daniels said that someone in his home had accessed child pornography, that only he and his wife lived there, and that in their experience, the husband is usually responsible. They did not describe or characterize the evidence against Mr. Wagner

29

as irrebuttable. At 35 minutes into the 43-minute interview, Agent Jones told Mr. Wagner that the interview was "really [his] only opportunity" to speak with them. *See* Hrg. Audio Ex. 9 at 40:18-36; Tr. Audio Ex. 3 at 34:00-14. We do not construe her statement as threatening. Moreover, Mr. Wagner had already admitted his past pornography addiction, the limited access to the laptop and wireless Internet connection, and the lack of visitors to the home in the last year.

Third, the record does not reflect the agents tried to exploit Mr. Wagner's PTSD or military career such that his "will [was] overborne." *Lopez*, 437 F.3d at 1063. He did not disclose his PTSD until 20 minutes into the interview and stated he did not then require medication. The recording reveals no attempt to influence Mr. Wagner based on his military background. *See United States v. Robertson*, 19 F.3d 1318, 1321 (10th Cir. 1994) ("[T]he police must somehow overreach by exploiting a weakness or condition known to exist.").

\* \* \* \*

The admission of Mr. Wagner's statements did not violate *Miranda* or his due process rights. The district court properly denied his motion to suppress them.

D. *Outrageous Conduct Motion*

The district court denied Mr. Wagner's motion to dismiss the indictment, concluding the Government's conduct was not outrageous in violation of due process. Mr. Wagner contends the FBI's operation of Playpen, a child pornography website, established the "extraordinary" outrageous conduct defense. *United States v. Pedraza*, 27 F.3d 1515, 1521 (10th Cir. 1994). We disagree.

30

### 1. Standard of Review

We review the denial of a motion to dismiss an indictment for outrageous government conduct de novo. *Perrine*, 518 F.3d at 1207.

### 2. Additional Legal Background

"When the government's conduct during an investigation is sufficiently outrageous, the courts will not allow the government to prosecute offenses developed through that conduct because [doing so] would offend the Due Process Clause of the Fifth Amendment." *Pedraza*, 27 F.3d at 1521 (quotations omitted). To prove outrageous government conduct, the defendant must show "either (1) excessive government involvement in the creation of the crime, or (2) significant governmental coercion to induce the crime." *United States v. Dyke*, 718 F.3d 1282, 1288 (10th Cir. 2013) (quotations omitted). Under "the totality of the circumstances[,] . . . the government's conduct [must be] so shocking, outrageous and intolerable that it offends the universal sense of justice." *Perrine*, 518 F.3d at 1207 (quotations omitted).

"Excessive government involvement occurs if the government engineers and directs the criminal enterprise from start to finish." *Pedraza*, 27 F.3d at 1521 (quotations omitted). It is not excessive for the government "to infiltrate an ongoing criminal enterprise" or "to induce a defendant to repeat or continue a crime or even to induce him to expand or extend previous criminal activity." *Dyke*, 718 F.3d at 1288 (quotations omitted). The government can, for instance, "suggest the illegal

31

activity," "provide supplies and expertise for the illegal activity," and "act as both supplier and buyer in sales of illegal goods." *Id.* (quotations omitted).

Governmental coercion must be "particularly egregious [to] rise[] to the level of outrageous conduct." *Pedraza*, 27 F.3d at 1521. "[I]f the defendant is already involved in criminal activity similar to the type of crime the government is attempting to induce him to commit, then the government's conduct is a less important consideration." *Dyke*, 718 F.3d at 1289 (quotations omitted); *see also United States v. Pawlak*, 935 F.3d 337, 344 (5th Cir. 2019) (holding that "[a] defendant who actively participates in the crime may not avail himself of [this] defense" (quotations omitted)).

Every circuit to consider the issue has held the FBI's operation of Playpen was not outrageous government conduct. *See United States v. Anzalone*, 923 F.3d 1, 6 (1st Cir. 2019); *Pawlak*, 935 F.3d at 345-46; *United States v. Harney*, 934 F.3d 502, 506-07 (6th Cir. 2019); *Kienast*, 907 F.3d at 530-31; *United States v. Tippens*, 773 F. App'x 383, 385 (9th Cir. 2019) (unpublished).[19]

3. **Analysis**

Mr. Wagner has not shown the Government's conduct was "so shocking . . . and intolerable that it offends the universal sense of justice." *Perrine*, 518 F.3d at 1207 (quotations omitted). The Government was not excessively involved in Playpen's operation and did not coerce Mr. Wagner's participation.

---

[19] *See* 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

The FBI did not "engineer[] and direct[] [Playpen's operation] from start to finish." *Dyke*, 718 F.3d at 1288 (quotations omitted). It did not create Playpen, alter the site's functionality, add child pornography, or solicit new users. It seized Playpen's servers and, pursuant to a warrant, hosted the website from a different location. Providing a suspect an opportunity "to expand or extend previous criminal activity" is not "excessive" government conduct. *Id*. (quotations omitted).

Nor did the FBI coerce Mr. Wagner to access Playpen or download child pornography. He was an "active consumer" of child pornography before the FBI hosted the website. *Pawlak*, 935 F.3d at 345. Indeed, the 4,311 images and 74 videos of child pornography found on the laptop in his home, App. at 578, strongly indicate he would have accessed Playpen without the FBI's intervention. *See Pedraza*, 27 F.3d at 1522-23 (finding no outrageous conduct where the defendants did not show "they lacked the capacity to commit the crime without the government's assistance" (alterations and quotations omitted)).[20]

Mr. Wagner has not shown the "egregious circumstances" necessary to warrant application of the "extraordinary" outrageous conduct defense. *Id*. at 1521. The district court properly denied his motion to dismiss the indictment.

---

[20] Mr. Wagner contends the FBI's operation of Playpen was outrageous because it facilitated a "heinous crime" and "re-victimize[d]" the children depicted on the website. Aplt. Br. at 37-38. The FBI determined that "operating Playpen for a brief period of time to catch the individuals who create the demand for more [child pornography]" outweighed the consequences of continuing access for 13 days. *Harney*, 934 F.3d at 507. Even if the FBI's "complex and carefully considered" approach to identifying Playpen's users may have been debatable, it did not violate due process. *Id*.

33

## E. *Hearsay Ruling*

The district court denied Mr. Wagner's motion under Federal Rule of Criminal Procedure 33 for a new trial, which was based on the hearsay ruling during defense counsel's cross-examination of Agent Jones. Mr. Wagner contends the hearsay ruling was erroneous and prevented his counsel from highlighting portions of his statements for the jury.

### 1. Standard of Review

We review a district court's denial of a motion for new trial for abuse of discretion. *Harte v. Bd. of Comm'rs of Cty. of Johnson*, 940 F.3d 498, 519 (10th Cir. 2019). A new trial on the basis of "an erroneous evidentiary ruling . . . will be ordered only if the error prejudicially affects a substantial right of a party." *United States v. Keck*, 643 F.3d 789, 795 (10th Cir. 2011) (quotations omitted); *see* Fed. R. Evid. 103(a) ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party . . . ."). An evidentiary error is prejudicial "only . . . if it can be reasonably concluded that [absent the evidentiary ruling], there would have been a contrary result." *Weaver v. Blake*, 454 F.3d 1087, 1091 (10th Cir. 2006) (quotations omitted).

### 2. Additional Procedural Background

The Government played the recording of Mr. Wagner's first interview during Agent Jones's direct examination. On cross-examination, Mr. Wagner's counsel began asking her about his statements. The Government asked to approach the bench and the following colloquy ensued:

[GOVERNMENT]: Your Honor, this is hearsay. I understand that those questions were covered in the interview, but Rule 801(d)(2) does not allow an opponent to introduce his own hearsay statements into evidence. . . .

THE COURT: Well, [if] you [are] offering these statements that Mr. Wagner, according to the witness, made to her, your offer of them is an offer of an out-of-court statement unless some exception qualifies?

[DEFENSE]: The – the recordings have been entered into evidence. I'm simply asking clarifying questions about what was said at this point. I'm not asking for the truth, just if they were said.

THE COURT: So what's the non[-]truth portion? Why is that relevant?

[DEFENSE]: It's relevant because Mrs. – the agent has already testified about what Mr. Wagner told her. So it's relevant to the fact just to make sure that is, in fact, what he told her.

THE COURT: Well, she testified to that statement. It[']s different when the government offers than when you offer because of the hearsay exception that permits her to do so. So I'm going to sustain the objection. To the extent you are seeking to elicit from this witness statements that someone made out of court, even Mr. Wagner, because it's hearsay, it's an out-of-court statement.

App. at 522-23. After the jury's verdict, Mr. Wagner moved for a new trial, asserting the court's hearsay ruling prevented his counsel from highlighting his potentially exculpatory interview statements.

3. **Analysis**

The district court's hearsay ruling, even if erroneous, was not prejudicial and does not warrant a new trial. The recording of Mr. Wagner's interview statements

35

"was played in court, with minimal redactions, for the jury to hear." Aplt. Br. at 42.[21]

Mr. Wagner's counsel had ample opportunity to highlight his statements without asking Agent Jones to repeat them on cross-examination. Counsel could, and indeed did, emphasize Mr. Wagner's statements during closing argument. *See, e.g.*, App. at 727 (stating "Mr. Wagner over and over again [told Agents Jones and Daniels] that he never viewed child pornography"). Because Mr. Wagner has not shown the court's hearsay ruling "prejudicially affect[ed] a substantial right," *Keck*, 643 F.3d at 795; *see* Fed. R. Evid. 103(a), the district court did not abuse its discretion in denying his motion for a new trial.

### F. *Sufficiency of Evidence*

Mr. Wagner argues the district court erred when it denied his motion under Federal Rule of Criminal Procedure 29(c) for judgment of acquittal based on insufficient evidence. We have reviewed the trial evidence and conclude it was sufficient to support Mr. Wagner's convictions.

### 1. Standard of Review

"We review de novo whether there was sufficient evidence to support a defendant's convictions, viewing all the evidence and any reasonable inferences drawn therefrom in the light most favorable to the government." *United States v. Isabella*, 918 F.3d 816, 830 (10th Cir. 2019) (citations omitted); *see United States v.*

---

[21] The jury also requested and received a laptop to listen to the interview recording again during deliberations. Dist. Ct. Docs. 72, 72-1.

*Wells*, 739 F.3d 511, 525 (10th Cir. 2014). We consider both circumstantial and direct evidence, "but we do not weigh the evidence or consider the credibility of witnesses." *Isabella*, 918 F.3d at 830. Acquittal for insufficient evidence is proper "only when no reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id*.

2. **Additional Procedural Background**

At trial, Agent Jones provided an overview of the execution of the NIT Warrant and Residence Warrant. As noted, the Government played the recording of Mr. Wagner's first interview during her testimony. Forensic examiner Amy Corrigan testified as an expert in digital forensics about the child pornography evidence found on devices seized from Mr. Wagner's home. We summarize her testimony below.

On the laptop, forensic examiner Corrigan identified 4,311 images and 74 videos of child pornography. App. at 577-78. She found a text file containing a 16-character web address for an index of TOR websites that included a link to Playpen. *Id*. at 580-83. She discovered references to TOR, Playpen, and other child exploitation materials on the laptop's Internet browsing history. *Id*. at 560-61, 572-73. She also found the laptop user had accessed the website chaturbate.com with the username soldiermike and the same email address soldiermike used to register for Playpen. *See id*. at 576-77. Finally, she noted the laptop's name was "SFC-Gunner," consistent with the NIT's identification. *Id*. at 553.[22]

---

[22] During the first interview, Mr. Wagner told the agents he retired from the military as a sergeant first class, Tr. Audio Ex. 3 at 03:09-12, which is abbreviated

On Mr. Wagner's cell phone, Ms. Corrigan found YouTube searches for "preteen," "Lolita sex," and "child panties," among others. *Id*. at 612-14. She noted the cell phone used email addresses associated with the laptop, including "sfc_wagner@yahoo.com." *Id*. at 619-20. She also found it contained images of nude females, some of whom appeared to be minors. *Id*. at 621-23.

3. **Additional Legal Background**

Mr. Wagner was convicted of receiving and possessing child pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (a)(4)(B). To prove the offenses, the Government had to show Mr. Wagner "knowingly receive[d]" and "knowingly possesse[d]" a "visual depiction" involving "the use of a minor engaging in sexually explicit conduct." 18 U.S.C. §§ 2252(a)(2), (a)(4)(B); *see* Supp. App. at 467 [Jury Instruction No. 10], 468 [Jury Instruction No. 11].

Mr. Wagner challenges the sufficiency of the evidence on whether he "knowingly received" and "knowingly possessed" child pornography. *See* Aplt. Br. at 46-47. Because the statute does not define these terms, "we are guided by [their] ordinary, everyday meaning." *United States v. Dobbs*, 629 F.3d 1199, 1203 (10th Cir. 2011) (quotations omitted). The district court defined "knowingly," "receive," and "possess" for the jury. The court's definitions, provided below, are uncontested on appeal and accord with our case law.

---

"SFC," U.S. Dep't of Veterans Affairs, *Veterans Employment Toolkit*, https://perma.cc/QT66-ET6T.

a. *Knowingly*

The court instructed the jury that "knowingly" means "the act was done voluntarily and intentionally, and not because of mistake or accident."  Dist. Ct. Doc. 70 at 17 [Jury Instruction No. 15]; *see Dobbs*, 629 F.3d at 1204 (concluding the "ordinary and everyday meaning" of "knowingly" under § 2252(a)(2) is "that an act was done . . . voluntarily and intentionally, and not because of mistake or accident" (quotations omitted)).

b. *Receive*

The court instructed the jury that "[t]o 'receive' a visual depiction means to take possession or accept delivery of it" and includes "download[ing] an image from the [I]nternet."  Dist. Ct. Doc. 70 at 14 [Jury Instruction No. 12] (emphasis omitted); *see Dobbs*, 629 F.3d at 1203 (adopting district court's definition of "receive" under § 2252(a)(2) as "to accept an object and to have the ability to control it" (quotations omitted)).

c. *Possess*

The court instructed the jury that possession may be "actual" or "constructive" and generally "means to own or to exert control over [an] object."  Dist. Ct. Doc. 70 at 14 [Jury Instruction No. 12] (emphasis omitted);[23] *see Haymond*, 672 F.3d at 955

---

[23] The court explained that a person has "actual possession" when he "knowingly has direct physical control over [it]" and "constructive possession" when he "knowingly has both the power and the intention . . . to exercise dominion or control . . . either directly or through another person or persons."  Dist. Ct. Doc. 70 at 14 [Jury Instruction No. 12].

(noting "possession of child pornography [under § 2252(a)(4)(B)] may be actual or constructive"); *United States v. Tucker*, 305 F.3d 1193, 1204 (10th Cir. 2002) (defining "possession" under § 2252(a)(4)(B) as "holding or having something . . . as one's own, or in one's control" (quoting Oxford English Dictionary (2d ed. 1989))).

4. **Analysis**

Viewing the evidence in the light most favorable to the Government, we conclude that Mr. Wagner has not shown that "no reasonable jury could find [him] guilty" of knowingly receiving and possessing child pornography. *Isabella*, 918 F.3d at 830.

NIT-transmitted data and subpoenaed records tied soldiermike to Mr. Wagner's residence. Playpen records showed that from January 31 to March 4, 2015, soldiermike logged into Playpen for eight hours and fifty-nine minutes. When soldiermike logged into Playpen on February 28, 2015, the NIT identified the activating computer's IP address. Supp. App. at 348. Subpoenaed records established that this IP address was registered to Mr. Wagner and his residence. *Id*. at 276.

Agents found substantial evidence of child pornography in Mr. Wagner's home. The laptop alone had thousands of images and videos of child pornography. It also contained evidence of Internet searches for terms relating to child pornography, App. at 572-73, 578, and a text file with a link to Playpen, *id*. at 582-83. Mr. Wagner's cellphone's browsing history included search terms indicating an interest in child exploitation materials. *Id*. at 612-14.

40

Evidence adduced at trial linked Mr. Wagner to the laptop. In his first recorded interview, he confirmed that he and his wife were the only people who used the laptop, Tr. Audio Ex. 3 at 24:26-35, that the wireless Internet connection was password-protected and did not extend beyond the driveway, *id*. at 22:17-23:35, and that no visitor had lived with them in the last year, *id*. at 05:50-07:25, 21:35-22:16. Mr. Wagner also admitted to having a past pornography addiction, *id*. at 13:20-14:30, and to accessing pornography the previous day, *id*. at 14:50-15:15.

Mr. Wagner argues the Government "left too many holes in its case" by not ruling out the possibility that a visitor to the Wagner residence downloaded the thousands of images of child pornography on the laptop that Mr. Wagner said only he and his wife used. Aplt. Br. at 46-47. Even if this were plausible, "the evidence necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt." *United States v. Magleby*, 241 F.3d 1306, 1312 (10th Cir. 2001) (quotations omitted). Given Mr. Wagner's past pornography addiction, the browsing history on his personal cellphone, the limited access to the laptop and Internet connection, and the multitude of child pornography images and videos found on the laptop, a reasonable jury could find beyond a reasonable doubt that Mr. Wagner knowingly received and possessed child pornography. *See Dobbs*, 629 F.3d at 1204 (finding "little doubt that [the defendant]—or at least his computer—'received' child pornography" where he "d[id] not contest that the government found images of child pornography on his computer").

41

## III.  CONCLUSION

We uphold Mr. Wagner's convictions and the district court's denials of his motions to suppress, to dismiss the indictment, and for a new trial.  We affirm the district court's judgment.